*462 UPON REHEARING EN BANC
ROBERT J. HUMPHREYS, Judge.
BACKGROUND[1]
On Thursday, November 18, 2004, John and Irene Powers (“the Powers”) had dinner with their thirty-three-year-old daughter, Sarah Crawford (“Sarah”) at a local restaurant in Manassas, Virginia. When they left the restaurant that night at about 8:30 pm, it would be the last time that they would see their daughter alive. Twelve hours later Sarah would be dead, and her husband, the appellant, Anthony Dale Crawford (“Crawford”) would be wanted for her murder.
The Powers had a “very close” relationship with their daughter and saw her frequently. Sarah and her mother talked on the phone often. During dinner, Sarah told her parents of the latest events in her life, including her job as an office manager for a television production company. Sarah mentioned to her mother that she had a hair appointment on Saturday and that, on Saturday afternoon, she had plans to go to a concert with a man she recently met. Sarah was, according to her mother, “really very happy” that night.
Sarah had every reason to be happy. She had a good job with a small, close-knit company that she enjoyed and found fulfilling. She had gastric bypass surgery in the summer of 2002 and reached her goal of losing one hundred and fifty pounds. In addition, Sarah had just gotten a raise and moved into her own apartment. And, most significantly, Sarah had recently decided to end her relationship with her abusive husband, Crawford.
Sarah and Crawford had been married since 1999, and had been together for several years before that. The couple had a *463 troubled history, and Sarah was growing increasingly fearful of her husband. In October of 2004, Sarah and Crawford separated. Following their separation, Sarah expressed to a number of friends and co-workers that she was afraid that Crawford might physically harm her. This concern caused Sarah to make a number of significant changes in her life. Sarah found a new apartment in a rural area that her mother described as “wooded, desolate,” and “well-hidden.” Sarah chose the apartment because it had a long driveway, so that she could “make a phone call” or “get out” if she saw someone coming.
On October 29, 2004, Sarah and the Powers went to Crawford’s apartment to pick up a few of Sarah’s things.[2] Sarah tried to get Crawford tickets to a sporting event.to get him out of the apartment because she was “afraid of an incident” arising from her move. However, Crawford was present in the apartment when Sarah and the Powers arrived. As Sarah expected, Crawford was hostile toward her, refused to allow her to take any of her belongings, and, ultimately, called the police. When the police arrived, they asked Crawford to calm down and to allow Sarah to take her things. However, despite the police officer’s request, Crawford’s hostile behavior toward Sarah continued. According to the police officer, as Sarah packed up her belongings, Crawford approached her and whispered something in her ear. The officer could not determine what Crawford said to Sarah, but the officer testified that “it was something that obviously upset [Sarah],” because she “immediately stood up and stepped back away from [Crawford].” Sarah then asked Crawford to repeat what he said and asked if Crawford was threatening her. The officer ordered Crawford to back away from Sarah; however, he had to repeat this command several times before Crawford complied. At one point, Mrs. Powers heard Crawford tell Sarah, ‘You’ll pay for this.”
*464 Eventually, the police officers left the apartment, but, sensing that things might not remain peaceful, they remained nearby. After the officers left, Sarah mentioned that she wanted a side table that her parents had given her, and she asked Crawford to unlock the bedroom door so she could retrieve it. Instead of unlocking the door, Crawford said that he would get the table. Mr. Powers was packing up some of Sarah’s belongings, when he heard Crawford say, “Here’s your god-damned table” and the table “came flying over [Mr. Powers’] right shoulder and ... landed near the sofa and broke____” At that point, the Powers called the police and the same officers immediately responded. The police stayed until Sarah and her family finished packing her things, and then followed them for about a mile to make sure that they got away safely.
Following her encounter with Crawford at the apartment, Sarah went to the Prince William County Juvenile and Domestic Relations District Court (the “JDR court”) and requested a preliminary protective order in order to prevent Crawford from having any further contact with her. In the affidavit for preliminary protective order (hereinafter “the affidavit”), which Sarah signed, she recounted past incidents in which Crawford forcibly raped her, threatened her life, and physically and verbally abused her. In the affidavit, Sarah also stated
[o]n October 80, 2004, [Crawford] called me and told me that I must want to die. He also said he understands why husbands kill their wives. He told me that he would find me and would come to my work.... I am afraid of [Crawford]. I fear he may physically hurt me or even kill me. I want him to stay away from me and my family.
The JDR court granted Sarah’s request for a preliminary protective order.[3] In the few weeks that the protective order was in effect, Sarah continued to have contact with Crawford. *465 Telephone records revealed that Crawford and Sarah communicated on several occasions between November 1 and November 18, 2004. Sarah also paid for Crawford to attend a trade school in Kentucky.
As Sarah began to settle into her new life, she tried to take precautions for her own safety. Sarah chose the location of her desk at work because it overlooked the parking lot and allowed her to see if Crawford’s vehicle was parked there. In addition, Sarah took a new route home every night after work. According to her supervisor, “[Sarah] would never go home the same way two days in a row because she didn’t want someone to be able to follow her or know where she was going to be at any particular time, so she would always choose a new way.” Sarah also spoke to her parents several times each day. On November 1, 2004, Sarah sought help from Acts Turning Points, a domestic violence intervention program in Prince William County.
On Thursday November 18, 2004, Sarah apparently sought to sever her last remaining ties with Crawford. On that day Sarah prepared a document that purported to release her father from any liability on the lease for the apartment that she previously shared with Crawford. Due to Crawford’s credit problems, Mr. Powers co-signed the lease for their apartment. Sarah now wanted her father’s name removed from the lease. Because her printer was broken, Sarah asked one of her supervisors to print out the release form on his printer that afternoon. A copy of that release was later recovered from her supervisor’s computer. Before Sarah left work on November 18, she informed her supervisor that she would be late the following morning, but she expected to be at the office by 1:00 p.m.
Sarah never made it to work on Friday, November 19, 2004. That morning, a hunter in Fauquier County found a box along the road that belonged to Sarah’s employer. Sarah’s supervisor testified that she was supposed to ship that box for him. The box had a small amount of Sarah’s blood on it. Later that day, the Powers received a telephone call from a person who *466 found Sarah’s cell phone lying in the grass near his driveway in Manassas.[4] Worried for their daughter’s well-being, the Powers made the first of several trips to Sarah’s apartment that evening. When they arrived, Sarah and her car were gone, and the apartment was dark. The only sign of life in the apartment was Sarah’s pet cat, which came to the glass door and cried.
On the morning of Saturday, November 20, 2004, the Powers went back to Sarah’s apartment. Sarah’s car was still missing, and her cat was still at the door, crying. Mrs. Powers called Sarah’s salon to see if she had arrived at her hair appointment on Saturday morning and was told she had not. The Powers made the fifty-minute round trip from their home to Sarah’s apartment three more times on Saturday. Each time they returned, Sarah’s cat cried and clawed at the door. The last time the Powers went to Sarah’s apartment on Saturday evening was around 8:00 p.m. They found a bottle of wine at the door with a note that said, “Sarah, sorry I missed you. Call me to let me know you’re okay.” Sarah had missed her Saturday afternoon date.
On Sunday, November 21, 2004, the Powers were finally able to reach Sarah’s landlord, who let them into her apartment. The first thing the Powers noticed was that her cat had no food or water. The Powers had taken care of Sarah’s cat when she had gone out of town before, and it was uncharacteristic for Sarah to leave her pet unattended and without food or water. After taking care of the cat, the Powers began looking around Sarah’s apartment to try to determine what had happened. Mrs. Powers noted that all of Sarah’s luggage was still in the apartment and that the clothes she had worn to dinner on Thursday were on the floor in front of her washing machine. Mrs. Powers went to Sarah’s bedroom and noticed that there was a book open to page fifty-nine lying face down on Sarah’s bedside table entitled, It’s My Life *467 Now: Starting Over After an Abusive Relationship or Domestic Violence.
In the early morning hours of November 22, 2004, the night manager of a motel in Charlottesville, Virginia found Sarah dead in one of the motel’s rooms, her body positioned in a particularly gruesome and suggestive manner. Stripped naked, Sarah was placed on the bed in a “frog-like position.” A motel towel concealed a fatal gunshot wound to the right side of her chest. An assistant chief medical examiner for the Commonwealth determined that the bullet passed through Sarah’s right lung and severed her spinal cord, rendering Sarah paralyzed, unable to walk or struggle. The medical examiner testified that, without medical treatment, Sarah could have lived up to an hour following such an injury. Investigators found seminal fluid in Sarah’s vagina and spermatozoa in Sarah’s mouth and anus. DNA recovered from the seminal fluid matched that of Crawford. In addition, investigators found Crawford’s clothing, personal belongings, and fingerprints in the motel room. Cigarette butts in the motel room’s ashtray contained Crawford’s DNA, and a pill bottle bearing Crawford’s name was also found in the room. The motel’s clerk testified that Crawford arrived at the motel at 11:00 a.m. on November 19, 2004. Crawford was driving Sarah’s car at the time[5] and parked in the farthest spot from the front desk. Crawford told the clerk that he had been driving all night and asked for a quiet room, which he paid for with a $100 bill.
Given the abundance of evidence linking him to the murder scene, the Charlottesville police began to search for Crawford. As part of that investigation, the police contacted Crawford’s relatives. Crawford’s adult daughter, who lived in South Carolina, reported that her father had contacted her recently and asked her to wire him money. With this information, the *468 police then learned that Crawford was staying with his extended family in Jacksonville, Florida.
The Charlottesville police informed their Jacksonville colleagues that they had reason to believe Crawford was in their area and that there was an outstanding warrant for his arrest for the murder of Sarah. The Charlottesville police also advised the Jacksonville authorities that Crawford was likely driving Sarah’s car, a maroon Hyundai. The Jacksonville police located Crawford and arrested him; they also seized Sarah’s car (which Crawford was driving at the time of his arrest) and sealed it for evidentiary purposes. The Charlottesville police later processed the car for evidence. The driver’s window of the vehicle was broken, and police found Sarah’s blood on both the driver’s and rear seats. The police found gunshot residue in the car and a box of ammunition in the trunk.
Crawford waived his Miranda rights and made a statement to the Florida police during a custodial interview. The interview was videotaped, and the recording was admitted into evidence at trial. Crawford claimed that Sarah had picked him up early Friday morning at his house. He said they had planned to go to Charlottesville for the weekend to attempt to reconcile. After an hour to an hour and a half drive, they arrived in Charlottesville at about 8:30 in the morning. Sarah was driving, and he was in the passenger’s seat. Crawford said they drove directly to a McDonalds and got breakfast.[6] Without any explanation as to why, Crawford then stated that he pulled out his .38 revolver[7] planning to commit suicide. Crawford said he had the gun cocked and his finger on the trigger when Sarah grabbed for the weapon. While they were *469 wrestling over the gun, it went off and the bullet hit Sarah. Crawford claimed the shooting was an accident, telling the police “she basically did it to herself.”
Crawford then said that he pulled Sarah into the back seat and drove to a nearby hotel and rented a room. He left Sarah’s body on the bed and her clothing in the room and “took off and headed south.” Significantly, Crawford never offered any explanation for leaving Sarah’s body undressed in the position in which it was found, nor for failing to seek medical help for Sarah. Likewise, he offered no explanation as to why his semen was found in her vagina and his sperm was found in her mouth and anus.[8]
Prior to trial, Crawford made a motion to suppress the affidavit executed by Sarah in support of the protective order, arguing that the document was testimonial hearsay and, therefore, inadmissible under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). During the suppression hearing, the Commonwealth did not dispute that the affidavit was testimonial hearsay. Instead, the Commonwealth argued that under the doctrine of forfeiture by wrongdoing, the trial court should find that Crawford forfeited his right to confrontation. The trial court agreed with the Commonwealth and admitted a redacted copy of the affidavit on those grounds. A jury subsequently convicted Crawford of capital murder, abduction with intent to defile, rape, grand larceny, use of a firearm in the commission of a murder, and use of a firearm in the commission of abduction. Crawford appealed his convictions to this Court.
On appeal, Crawford contends that the trial court erred in (1) denying his motion to suppress an affidavit made by Sarah Crawford, which was submitted to the JDR court in conjunction with her application for a preliminary protective order[9] *470 and (2) failing to grant his motion to strike the charges of abduction with intent to defile and rape, “since there was insufficient evidence to permit these issues to go to the jury.”
On December 23, 2008, a divided panel of this Court reversed all of Crawford’s convictions with the exception of his conviction for grand larceny. See Crawford v. Commonwealth, 53 Va.App. 138, 670 S.E.2d 15 (2008). The panel majority held that the trial court’s admission of the affidavit violated Crawford’s rights under the Confrontation Clause. The majority further held that the evidence was insufficient to support Crawford’s convictions for rape, abduction with intent to defile, and use of a firearm in the commission of abduction. The majority also reversed Crawford’s conviction for capital murder, since it reversed the convictions on which the capital murder charge was based. The panel dissent disagreed with the majority only in its sufficiency analysis as to the charge of abduction with intent to defile.
The Commonwealth petitioned the full Court for rehearing en banc, and on January 27, 2009, we granted the Commonwealth’s petition and stayed the mandate of the panel opinion.[10] For the following reasons, we disagree with Crawford and the analysis of both the panel majority and dissent, and we affirm Crawford’s convictions.
*471 ANALYSIS
I. The Confrontation Clause and the Admissibility of the Affidavit
In denying Crawford’s motion to suppress the statements contained in the affidavit, the trial court found that Crawford “ha[d] forfeited his Sixth Amendment right to confront [Sarah’s] testimony because he intentionally procured her unavailability to testify.” In reaching this conclusion, the trial court stated that, “[t]o apply the forfeiture by wrongdoing doctrine, this [c]ourt must find by a preponderance of the evidence ... that [Crawford] is responsible for [Sarah’s] unavailability as a witness and therefore forfeited his right to assert the Confrontation Clause to suppress the statements contained in the affidavit[ ].”
Crawford contends that the trial court misapplied the “forfeiture by wrongdoing doctrine” and, therefore, under the United States Supreme Court’s analysis in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the trial court’s admission of the challenged affidavit violated his rights under the Confrontation Clause of the Sixth Amendment. The Commonwealth responds that the trial court did not err in applying the forfeiture doctrine to the affidavit and also alternatively argues, for the first time on appeal, that the Confrontation Clause does not bar the admission of the affidavit because it is not “testimonial” in nature. Although we conclude that the trial court failed to make the factual findings required as a prerequisite for the application of the forfeiture by wrongdoing doctrine, we hold that the affidavit was admissible nonetheless.
“The Confrontation Clause of the Sixth Amendment provides: ‘In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.’ ” Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006) (quoting U.S. Const, amend. VI). In Crawford, the Supreme Court of the United States held that the Confrontation Clause barred the “admission of testimonial statements of a witness who did not appear at trial unless he *472 was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” 541 U.S. at 53-54, 124 S.Ct. at 1365. That said, the Supreme Court has acknowledged two common law exceptions to a defendant’s right of confrontation, which were well established and known to the framers of the Sixth Amendment: dying declarations and forfeiture by wrongdoing. Id. at 56 n. 6, 62, 124 S.Ct. at 1367 n. 6, 1371-72.
While this appeal was pending, the Supreme Court decided Giles v. California, — U.S. -, -, 128 S.Ct. 2678, 2683, 171 L.Ed.2d 488 (2008).[11] In Giles, the Court discussed both the history and applicability of the doctrine of forfeiture by wrongdoing as it pertains to a defendant’s Sixth Amendment right to confrontation. “Forfeiture by wrongdoing” is a common-law doctrine that “permitted the introduction of statements of a witness who was ‘detained’ or ‘kept away’ by the ‘means or procurement’ of the defendant.” Id. at -, 128 S.Ct. at 2683, 171 L.Ed.2d at 495 (citations omitted). In other words, where a defendant has caused a witness to be unavailable to testify, he forfeits his constitutional right to confront that witness. After a careful and thorough examination of the history of forfeiture by wrongdoing, the Supreme Court made clear in Giles that the doctrine only applied “when the defendant engaged in conduct designed to prevent the witness from testifying.” Id. (emphasis in original). Thus, under the doctrine of forfeiture by wrongdoing, “unconfronted testimony would not be admitted without a showing that the *473 defendant intended to prevent a witness from testifying.” Id. at-, 128 S.Ct. at 2684, 171 L.Ed.2d at 497 (emphasis in original).
Significantly, in that portion of Justice Scalia’s opinion in Giles supported by a clear majority of the justices, the Supreme Court left open the possibility that a defendant’s intention to prevent testimony might be inferred from the surrounding circumstances, such as in a case of ongoing domestic violence:
Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.
Id. at-, 128 S.Ct. at 2693, 171 L.Ed.2d at 506 (emphasis added). In his concurrence, Justice Souter expounded upon the Court’s rationale with respect to situations of domestic violence.
Examining the early cases and commentary, however, reveals two things that count in favor of the Court’s understanding of forfeiture when the evidence shows domestic abuse. The first is the substantial indication that the Sixth Amendment was meant to require some degree of intent to thwart the judicial process before thinking it reasonable to hold the confrontation right forfeited; otherwise the right would in practical terms boil down to a measure of reliable hearsay, a view rejected in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The second is the absence from the early material of any reason to doubt that the element of intention would normally be *474 satisfied by the intent inferred on the part of the domestic abuser in the classic abusive relationship, which is meant to isolate the victim from outside help, including the aid of law enforcement and the judicial process. If the evidence for admissibility shows a continuing relationship of this sort, it would make no sense to suggest that the oppressing defendant miraculously abandoned the dynamics of abuse the instant before he killed his victim, say in a fit of anger.
Id. at-, 128 S.Ct. at 2695, 171 L.Ed.2d at 508 (Souter, J., concurring) (emphasis added).
In the case at bar, the Commonwealth presented no direct evidence that Crawford acted with the intent to prevent Sarah from testifying against him, nor did the trial court find that the circumstantial evidence of domestic abuse was sufficient to support an inference that Crawford intended to prevent Sarah from seeking redress for, or protection from, such abuse through the courts. By not considering Crawford’s intent, the trial court incorrectly applied the forfeiture by wrongdoing doctrine, as it was defined in Giles. Thus, the trial court erred in its analysis for admitting the affidavit on that basis.
If this were the end of our analysis, we would remand this case back to the trial court for it to determine on retrial whether an intent on the part of Crawford “to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution” can be reasonably inferred from the facts and circumstances of the case.[12] Id. at *475 -, 128 S.Ct. at 2698, 171 L.Ed.2d at 506. However, our analysis is not yet complete because, as the Commonwealth argues on brief, although the trial court admitted the affidavit based upon the applicability of the forfeiture by wrongdoing doctrine, another rationale for its admissibility is reflected in *476 the record before us, and we find that rationale sufficient to affirm the decision of the trial court in admitting the affidavit.
In its ruling on Crawford’s motion to suppress, the trial court found that the statements contained in the affidavit “do fall within the scope of Crawford.” The trial court reached this conclusion because, in Crawford, the Supreme Court specifically included affidavits in its non-exhaustive list of the types of testimonial statements. 541 U.S. at 51, 124 S.Ct. at 1364. At the suppression hearing, the Commonwealth neither conceded nor disputed the trial court’s analysis with respect to this issue. However, on appeal, the Commonwealth explicitly takes the position that the affidavit was not “testimonial,” and thus, not “within the scope of Cranford.”[13] Initially, we note that the mere fact the Commonwealth did not dispute the testimonial character of the statements during the motion to suppress does not necessarily preclude us from addressing the issue on appeal.
An appellate court cannot vacate a criminal conviction that violates no recognizable legal principle simply on the ground that the prosecutor (or, for that matter, the trial judge) did not articulate the proper legal basis for it. Thus, an appellee may argue for the first time on appeal any legal ground in support of a judgment so long as it does not require new factual determinations, [Harris v. Commonwealth, 39 Va.App. 670, 676, 576 S.E.2d 228, 231 (2003) (en banc)], or involve an affirmative defense that must be “asserted in the pleadings,” Eason v. Eason, 204 Va. 347, 352, 131 S.E.2d 280, 283 (1963), or serve as a subterfuge for a constitutionally prohibited cross-appeal in a criminal case, Hart v. Commonwealth, 221 Va. 283, 290, 269 S.E.2d 806, 811 (1980).
*477 Blackman v. Commonwealth, 45 Va.App. 633, 642-43, 613 S.E.2d 460, 465 (2005);[14] see also Wright v. Commonwealth, 278 Va. 754, 760 n. 3, 685 S.E.2d 655, 658 n. 3 (2009) (noting that “[although the record reflects that the Commonwealth apparently ‘conceded’ that the statute contained a nexus requirement, the issue is a question of law which is not subject to a concession binding on this Court”); Whitehead v. Commonwealth, 278 Va. 105, 677 S.E.2d 265 (2009), modified, No. 080775 (Oct. 22, 2009) (agreeing with our analysis of the right result wrong reason doctrine in Harris and Blackman); Logan v. Commonwealth, 47 Va.App. 168, 622 S.E.2d 771 (2005) (en banc).
The Confrontation Clause only applies to testimonial hearsay. That is because only those statements that are “testimonial” in nature “cause the declarant to be a ‘witness’ within the meaning of the Confrontation Clause.” Davis, 547 U.S. at 821, 126 S.Ct. at 2273. Indeed, “[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.” Id. *478 (emphasis added). In explaining the distinction between testimonial and nontestimonial statements, the Supreme Court in Davis held as follows:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Id. at 822, 126 S.Ct. at 2273-74 (emphasis added). “[T]his holding necessarily implies that consciousness on the part of the person reporting an emergency (or the police officer eliciting information about the emergency) that his or her statements might be used as evidence in a crime does not lead to the conclusion ipso facto that the statement is testimonial.” United States v. Ellis, 460 F.3d 920, 926 (7th Cir.2006) (emphasis added).[15]
The statements at issue in this appeal are contained within an “Affidavit for Preliminary Protective Order.” Although the Supreme Court of the United States recently stated that affidavits “fall within the ‘core class of testimonial statements’ ” subject to the Confrontation Clause, we find it significant that the Court did not go as far as to hold that all affidavits are per se testimonial. Melendez-Diaz v. Massachusetts, - U.S. -, -, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009). In fact, neither Melendez-Diaz, nor any *479 other case from the Supreme Court for that matter, has overruled or limited the applicability of the primary purpose test set forth in Davis. Lacking any further guidance on the matter from the Supreme Court, it becomes our task to attempt to reconcile the language in Davis with that in Melendez-Diaz and to determine whether the primary purpose test set forth in Davis is applicable to an affidavit unrelated to a criminal prosecution or whether conversely, any and all affidavits are ipso facto testimonial, irrespective of the primary purpose for their existence.[16]
Justice Scalia’s majority opinion in Crawford makes it clear that the evil the Confrontation Clause was intended to prevent was the purposeful creation and use in a criminal case of an affidavit as a substitute for the live testimony of a witness, as he noted was the case in the famous trial of Sir Walter Raleigh, and as was also the case in Melendez-Diaz. After carefully reviewing the holdings of Crawford, Davis, and Melendez-Diaz, we see no principled reason to conclude that a hearsay statement obtained for a purpose other than criminal prosecution should be treated differently with respect to the Confrontation Clause solely because it takes the form of an affidavit. Thus, the mere fact that the statements at issue in this case are contained within an affidavit is not dispositive to our analysis, and we must still look to the “primary purpose of the interrogation” to determine whether the statements are of a testimonial or nontestimonial character. Davis, 547 U.S. at 822, 126 S.Ct. at 2273.
It is undisputed that Sarah made the statements contained in the affidavit for the purpose of obtaining a preliminary protective order[17] pursuant to Code § 16.1-253.1.
*480 The statute provides, in pertinent part, that:
Upon the filing of a petition alleging that the petitioner is or has been, within a reasonable period of time, subjected to family abuse, the court may issue a preliminary protective order against an allegedly abusing person in order to protect the health and safety of the petitioner.... The order may be issued in an ex parte proceeding upon good cause shown when the petition is supported by an affidavit or sworn testimony before the judge or intake officer.
Code § 16.1-253.1(A) (emphasis added). From the plain language of the statute and as Judge Elder’s dissent acknowledges, it is clear that the primary purpose of the affidavit is not to initiate or further a criminal prosecution, but rather “to protect the health and safety of the petitioner” from an abuser by obtaining an ex parte preliminary protective order, a proceeding that is purely civil in nature. Id.[18]
*481 Because the primary purpose of the affidavit was not to “prove past events potentially relevant to later criminal prosecution” but rather to obtain a civil, preliminary protective order, we hold that the statements contained therein were nontestimonial under Davis and, therefore, did not implicate Crawford’s Sixth Amendment right to confrontation. 547 U.S. at 822, 126 S.Ct. at 2274. For that reason, the trial court’s decision to admit the affidavit was not error.
II. Abduction with Intent to Defile and Rape
Crawford further contends that the evidence adduced at trial was insufficient to sustain his convictions for abduction with intent to defile and rape. Specifically, Crawford asserts that, without the affidavit, the Commonwealth failed to exclude every reasonable hypothesis of his innocence. We disagree.
“[W]hen assessing the sufficiency of the evidence on appeal, “we consider all admitted evidence, including illegally admitted evidence.’ ” Sprouse v. Commonwealth, 53 Va.App. 488, 493, 673 S.E.2d 481, 483 (2009) (quoting Hargraves v. Commonwealth, 37 Va.App. 299, 312-13, 557 S.E.2d 737, 743 (2002)). In this case, the jury found the evidence, including the affidavit, sufficient to sustain Crawford’s convictions. Therefore, we must also consider the affidavit in our sufficiency analysis. However, during oral argument, counsel for Crawford conceded that, if the affidavit were admissible, the evidence was sufficient to convict him of abduction with intent to defile and rape.
[A]n appellant’s concession of law [ ] qualifies either as a waiver for purposes of Rule 5A:18 or as an express withdrawal of an appellate challenge to a trial court judgment. In either scenario, we may accept the concession-not as a basis for deciding the contested issue of law, but as a basis for not deciding it.
Logan, 47 Va.App. at 173 n. 4, 622 S.E.2d at 773 n. 4. Given Crawford’s concession we need not address the issue any *482 further and hold that the evidence is sufficient to sustain convictions for both charges. Thus, we affirm Crawford’s convictions for abduction with intent to defile and rape.
CONCLUSION
For the foregoing reasons, we hold that the trial court incorrectly applied the forfeiture by wrongdoing doctrine because it did not consider whether Crawford acted with the intent to prevent Sarah from either testifying as a witness or seeking aid from the judicial process. However, because we hold that the statements contained in the affidavit were not testimonial under Davis, and thus, did not implicate Crawford’s Sixth Amendment right to confrontation, the trial court’s ultimate admission of the affidavit was not error. Finally, given counsel for Crawford’s concession that, with the affidavit, the evidence is sufficient to sustain his convictions for abduction with intent to defile and rape, we hold that Crawford has waived his argument with respect to this issue. Therefore, we affirm all of Crawford’s convictions.[19]

Affirmed.

. On appeal, we view the facts established at trial in the "light most favorable” to the prevailing party below, in this case the Commonwealth, Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003), and we grant to that party all fair inferences flowing from those facts. Coleman v. Commonwealth, 52 Va.App. 19, 21, 660 S.E.2d 687, 688 (2008).

. Before they separated, Sarah shared the apartment with Crawford.

. The protective order prohibited Crawford from having any contact with his wife. At a court hearing on November 16, 2004, Sarah appeared in the JDR court and asked that the protective order be dismissed. The record does not establish why she made this request.

. Records from Sarah's cell phone revealed that Sarah called Crawford twice on November 19, 2004, once at 7:52 a.m. and again at 8:51 a.m.

. Although characterized by the Powers and other witnesses as "Sarah’s car,” the evidence adduced at trial established that the vehicle Crawford was driving actually belonged to Mr. Powers.

. The autopsy report, which was admitted into evidence, described the contents of Sarah’s stomach as "a scant amount (20 cc) of thin yellow fluid.”

. The police learned that on November 6, 2004, Crawford purchased a .38 Smith & Wesson revolver. He later purchased a box of .38 caliber ammunition on November 13, 2004. Although Crawford disposed of his revolver, police found a box of ammunition in his possession after Sarah was shot and killed. Two cartridges were missing from the box.

. Appellant's brief states "[d]uring the course of their travel [from Manassas to Charlottesville] they engaged in consensual intercourse.” The record is totally devoid of any evidence to support this assertion.

. Because this issue before us involves only a constitutional question, we do not address the applicability of the rules of evidence with respect *470 to the admissibility of the affidavit, either as a whole, or in redacted form.

. Crawford’s brief contains a third question presented: "Did the trial court err in admitting non-testimonial statements of the decedent made to several friends and co-workers?” However, the Commonwealth’s petition for rehearing en banc, which we granted in full, did not include this question presented. As counsel for Crawford conceded at oral argument, this issue is not before this Court upon rehearing en banc. See Ferguson v. Commonwealth, 51 Va.App. 427, 658 S.E.2d 692 (2008). Therefore, we reinstate the mandate issued in connection with the panel opinion with respect to this issue.

. Giles was a plurality opinion of the Supreme Court. Therefore, " 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....' ” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976)). By "jointing] all but Part II-D-2 of [Justice Scalia’s] opinion," Justices Souter and Ginsburg's concurrence provided a clear majority on the remaining portions of the opinion. Giles,-U.S. at-, 128 S.Ct. at 2694, 171 L.Ed.2d at 507 (Souter, J., concurring). Thus, Justice Scalia’s opinion, minus Part II-D-2, constitutes the holding of Giles, as it is the narrowest position of at least five Justices concurring in the result.

. In Giles, the Supreme Court vacated the appellant's conviction and remanded the case "for further proceedings not inconsistent with [the] opinion.” - U.S. at-, 128 S.Ct. at 2693, 171 L.Ed.2d at 506. Like Giles, the trial court in this case "did not consider the intent of [Crawford] because [it] found that irrelevant to application of the forfeiture doctrine. This view of the law was error, but the [trial] court is free to consider evidence of the defendant's intent on remand.” Id.
Judge Elder’s dissent takes the position that such a remand is unnecessary given the prosecutor's "concession” that the Commonwealth lacked evidence that Crawford killed Sarah for the sole purpose of preventing her from testifying against him. However, his position ignores the fact that the holding of Giles is that the forfeiture doctrine is *475 broader than simply killing a witness to prevent that witness from testifying in a pending case. As noted above, Giles holds that the forfeiture doctrine also applies in domestic violence situations where there is evidence of "the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution." Id. at --, 128 S.Ct. at 2693, 171 L.Ed.2d at 506 (emphasis added). As discussed more fully below, the prosecutor's statement can hardly be read to concede the lack of such intent given the record in this case.
Judge Elder’s dissent also takes the position that the Commonwealth has "approbated and reprobated" by taking inconsistent positions at trial and on appeal. The context for our disagreement with Judge Elder on this point is the query from the trial court to the prosecutor that "the evidence is not likely to show that there was some proof of intent ..." and "that it’s a two-prong and not a three-prong test. Is that right?” The prosecutor’s response is "That’s correct, Your Hon- or....” Judge Elder views the answer from the prosecutor as a concession by the Commonwealth that it lacks proof of Crawford’s intent. However, it is equally as likely that the prosecutor simply agreed with the trial court as to the number of prongs in the test. In any event, even if the prosecutor’s agreement with the trial court’s statement is viewed as a concession that the Commonwealth cannot meet an evidentiary standard, it is not inconsistent and/or contradictory for the Commonwealth to say in effect "We may not have evidence of intent, but we don’t need it because it's not required.”
Furthermore, the uniquely independent constitutional roles of the Attorney General and the Commonwealth’s Attorney must be distinguished from each other. As our Supreme Court has noted, because of this distinction, unlike other parties in a case on appeal, the Attorney General may expressly ”repud[iate] the earlier position erroneously taken by the Commonwealth's Attorney____” In re Department of Corrections, 222 Va. 454, 465, 281 S.E.2d 857, 863 (1981); see also Cross v. Commonwealth, 49 Va.App. 484, 494, 642 S.E.2d 763, 768 (2007). Judge Elder’s reliance on In re Commonwealth, 278 Va. 1, 13, 677 S.E.2d 236, 241 (2009), is misplaced. In re Commonwealth was not a criminal appeal. Therefore, the Commonwealth was not represented by the Attorney General, but rather by the Commonwealth’s Attorney. Our Supreme Court held that the Commonwealth was es-topped because the Commonwealth's Attorney, the sole representative of the Commonwealth, took inconsistent positions before the trial court and on appeal. Significantly, In re Commonwealth in no way overrules or limits the Supreme Court’s analysis in In re Department of Corrections, which allows the Attorney General to repudiate a position previously taken by the Commonwealth’s Attorney.

. The record of the suppression hearing reflects that, following the argument of counsel for Crawford that the affidavit was testimonial and before hearing any argument in response from the Commonwealth, the trial court observed sua sponte that the affidavit was testimonial but arguably admissible under the forfeiture by wrongdoing doctrine. The arguments of counsel then focused on whether that rationale applied. The letter opinion of the trial court states that the Commonwealth "does not dispute” that the affidavit was testimonial.

. It is important to note that the decision before us on appeal is the trial court’s decision to deny Crawford’s motion to suppress and to admit the affidavit as evidence. Because the trial court ruled in the Commonwealth’s favor and admitted the affidavit, the Commonwealth had nothing to appeal. Thus, contrary to the position of Judge Elder’s dissent, this is not a situation where the Commonwealth is pursuing a constitutionally prohibited cross-appeal but rather, is simply a case of the prevailing party below raising an alternate basis for affirming the trial court, which we must consider if it is supported by the record in this case. Furthermore, our consideration of whether the statements contained in the affidavit were of a testimonial character was squarely before the trial court and our resolution of this issue requires no additional fact-finding. See Harris, 39 Va.App. at 676, 576 S.E.2d at 231 ("In addition, the proper application of this rule does not include those cases where, because the trial court has rejected the right reason or confined its decision to a specific ground, further factual resolution is needed before the right reason may be assigned to support the trial court’s decision.”); see also Commonwealth v. Shifflett, 257 Va. 34, 44, 510 S.E.2d 232, 237 (1999) (“[A]n appellate court ought to decide cases based on the record made in the court below. The appellate court, in fairness -to the trial judge, should not recast the evidence and put a different twist on a question that is at odds with the question presented to the trial court.”).

. Both dissents take the position that because an affidavit for a protective order might be used in a criminal proceeding, all such affidavits are testimonial for Sixth Amendment purposes. Given that the gravamen of any contempt proceeding or misdemeanor prosecution for violation of a protective order is the violation of the order itself, it is difficult to conceive of any relevance to the use by the Commonwealth of the underlying affidavit but in any event, the dissents’ speculation about possible future use in a criminal case is true of any out-of-court statement. Thus, the position of the dissents necessarily emasculates any primary purpose analysis under Davis.

. Affidavits may be, and often are, created for purposes unrelated to a criminal prosecution. For example, an affidavit of loss may be required by an insurance company as a prerequisite to process an insurance claim or required by a bank in order to replace a lost or stolen credit card, or may be required by law to obtain injunctive relief. See e.g. Code § 8.01-628; Code § 48-17.1.

. During oral argument, counsel for Crawford conceded that the primary purpose of the affidavit was not in furtherance of potential *480 criminal prosecution but for the purpose of obtaining a protective order.

. In other constitutional contexts, the Supreme Court of the United States has noted that while the provisions of the Fifth and Sixth Amendments apply only to "criminal” matters, the labels "civil” and "criminal” are not dispositive. "The critical features are the substance of the proceeding and the character of the relief that the proceeding will afford.” Hicks v. Feiock, 485 U.S. 624, 625, 108 S.Ct. 1423, 1426, 99 L.Ed.2d 721 (1988); see also Hudson v. United States, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).
As provided by Code § 16.1-253.1, the procedure for obtaining a protective order is an ex parte rather than an adversary proceeding and involves the restriction of conduct for the express and sole purpose of protection. Moreover, any sanction or punishment relates solely to the disobedience of the court order and not to any past conduct that might be reflected in the affidavit. In short, and contrary to the position of Judge Beales' dissent, the procedures used and the relief provided by the statute are in the nature of those used to obtain injunctive relief and thus are clearly civil in nature and not a criminal prosecution subject to the application of the Sixth Amendment. Other jurisdictions share this view of protective orders. See Katsenelenbogen v. Katsenelenbogen, 365 Md. 122, 775 A.2d 1249, 1256 (2001) (observing that civil protection orders were not designed as "punishment for past conduct,” but to "prevent further harm to the victim”); see also Cooke v. Naylor, 573 A.2d 376, 377 (Me. 1990) (noting that a protective "order is historically an equitable remedy, very similar to an injunction”); State ex rel. S.M., 719 So.2d 445, 453 (La.1998).

. Because we affirm Crawford’s convictions for abduction with intent to defile and rape, we also affirm his convictions for capital murder, use of a firearm in the commission of a murder, and use of a firearm in the commission of an abduction.