Present: Hassell, C.J., Koontz, Kinser, Lemons, Goodwyn, and
Millette, JJ., and Carrico, S.J.

ANTHONY DALE CRAWFORD

v. Record No. 100202    OPINION BY JUSTICE DONALD W. LEMONS
                                January 13, 2011
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Anthony Dale Crawford ("Crawford") was convicted in the

Circuit Court for the City of Charlottesville of capital

murder, abduction with intent to defile, use of a firearm in

the commission of a murder, use of a firearm in the commission

of an abduction, rape, and grand larceny. Among the several

issues we address in this appeal is Crawford's contention that

the trial court erred in admitting into evidence an affidavit

in violation of his rights under the Confrontation Clause of

the Sixth Amendment to the United States Constitution.

I.  Facts and Proceedings Below[1]

On Thursday, November 18, 2004, John and Irene Powers

("the Powers") had dinner with their thirty-three-year-old

daughter, Sarah Crawford ("Sarah") at a local restaurant in

Manassas, Virginia. When they left the restaurant that night

at about 8:30 pm, it would be the last time that they would

see their daughter alive. Twelve hours later Sarah would be

---

[1] The Facts and Proceedings below are taken almost verbatim
from the compelling narrative written by Judge Humphreys in his
en banc opinion in the Court of Appeals, 55 Va. App. 457, 462-
70, 686 S.E.2d 557, 559-63 (2009).

dead, and her husband, the appellant, Anthony Dale Crawford ("Crawford") would be wanted for her murder.

The Powers had a "very close" relationship with their daughter and saw her frequently. Sarah and her mother talked on the phone often. During dinner, Sarah told her parents of the latest events in her life, including her job as an office manager for a television production company. Sarah mentioned to her mother that she had a hair appointment on Saturday and that, on Saturday afternoon, she had plans to go to a concert with a man she recently met. Sarah was, according to her mother, "really very happy" that night.

Sarah had every reason to be happy. She had a good job with a small company that she enjoyed and found fulfilling. She had gastric bypass surgery in the summer of 2002 and reached her goal of losing one hundred and fifty pounds. In addition, Sarah had just gotten a raise and moved into her own apartment. And, most significantly, Sarah had recently decided to end her relationship with her abusive husband, Crawford.

Sarah and Crawford had been married since 1999, and had been together for several years before that. The couple had a troubled history, and Sarah was growing increasingly fearful of her husband. In October of 2004, Sarah and Crawford separated. Following their separation, Sarah expressed to a

number of friends and co-workers that she was afraid that Crawford might physically harm her. This concern caused Sarah to make a number of significant changes in her life. Sarah found a new apartment in a rural area that her mother described as "wooded, desolate," and "well-hidden." Sarah chose the apartment because it had a long driveway, so that she could "make a phone call" or "get out" if she saw someone coming.

On October 29, 2004, Sarah and the Powers went to Crawford's apartment to pick up a few of Sarah's things. Before they separated, Sarah shared the apartment with Crawford. Sarah tried to get Crawford tickets to a sporting event to get him out of the apartment because she was "afraid of an incident" arising from her move. However, Crawford was present in the apartment when Sarah and the Powers arrived. As Sarah expected, Crawford was hostile toward her, refused to allow her to take any of her belongings, and, ultimately, called the police. When the police arrived, they asked Crawford to calm down and to allow Sarah to take her things. However, despite the police officer's request, Crawford's hostile behavior toward Sarah continued. According to the police officer, as Sarah packed up her belongings, Crawford approached her and whispered something in her ear. The officer could not determine what Crawford said to Sarah, but

the officer testified that "it was something that obviously upset [Sarah]," because she "immediately stood up and stepped back away from [Crawford]." Sarah then asked Crawford to repeat what he said and asked if Crawford was threatening her. The officer ordered Crawford to back away from Sarah; however, he had to repeat this command several times before Crawford complied. At one point, Mrs. Powers heard Crawford tell Sarah, "You'll pay for this."

Eventually, the police officers left the apartment, but, sensing that things might not remain peaceful, they remained nearby. After the officers left, Sarah mentioned that she wanted a side table that her parents had given her, and she asked Crawford to unlock the bedroom door so she could retrieve it. Instead of unlocking the door, Crawford said that he would get the table. Mr. Powers was packing up some of Sarah's belongings, when he heard Crawford say, "Here's your god-damned table" and the table "came flying over [Mr. Powers'] right shoulder and . . . landed near the sofa and broke . . . ." At that point, the Powers called the police and the same officers immediately responded. The police stayed until Sarah and her family finished packing her things, and then followed them for about a mile to make sure that they got away safely.

Following her encounter with Crawford at the apartment,

Sarah went to the Prince William County Juvenile and Domestic Relations District Court (the "JDR court") and requested a preliminary protective order in order to prevent Crawford from having any further contact with her. In the affidavit for preliminary protective order (hereinafter "the affidavit"), which Sarah signed, she recounted past incidents in which Crawford forcibly raped her, threatened her life, and physically and verbally abused her. In the affidavit, Sarah also stated

> [o]n October 30, 2004, [Crawford] called me and
> told me that I must want to die. He also said he
> understands why husbands kill their wives. He told
> me that he would find me and would come to my work.
> . . . I am afraid of [Crawford]. I fear he may
> physically hurt me or even kill me. I want him to
> stay away from me and my family.

The JDR court granted Sarah's request for a preliminary protective order.[2] In the few weeks that the protective order was in effect, Sarah continued to have contact with Crawford. Telephone records revealed that Crawford and Sarah communicated on several occasions between November 1 and November 18, 2004. Sarah also paid for Crawford to attend a trade school in Kentucky.

As Sarah began to settle into her new life, she tried to

_____

[2] The protective order prohibited Crawford from having any contact with his wife. At a court hearing on November 16, 2004, Sarah appeared in the JDR court and asked that the protective order be dismissed. The record does not establish why she made this request.

5

take precautions for her own safety. Sarah chose the location of her desk at work because it overlooked the parking lot and allowed her to see if Crawford's vehicle was parked there. In addition, Sarah took a new route home every night after work. According to her supervisor, "[Sarah] would never go home the same way two days in a row because she didn't want someone to be able to follow her or know where she was going to be at any particular time, so she would always choose a new way." Sarah also spoke to her parents several times each day. On November 1, 2004, Sarah sought help from a domestic violence intervention program in Prince William County.

On Thursday, November 18, 2004, Sarah apparently sought to sever her last remaining ties with Crawford. On that day Sarah prepared a document that purported to release her father from any liability on the lease for the apartment that she previously shared with Crawford. Due to Crawford's credit problems, Mr. Powers had co-signed the lease for their apartment. Sarah now wanted her father's name removed from the lease. Because her printer was broken, Sarah asked one of her supervisors to print out the release form on his printer that afternoon. A copy of that release was later recovered from her supervisor's computer. Before Sarah left work on November 18, she informed her supervisor that she would be late the

following morning, but she expected to be at the office by 1:00 p.m.

Sarah never made it to work on Friday, November 19, 2004. That morning, a hunter in Fauquier County found a box along the road that belonged to Sarah's employer. Sarah's supervisor testified that she was supposed to ship that box for him. The box had a small amount of Sarah's blood on it. Later that day, the Powers received a telephone call from a person who found Sarah's cell phone lying in the grass near his driveway in Manassas.[3] Worried for their daughter's well-being, the Powers made the first of several trips to Sarah's apartment that evening. When they arrived, Sarah and her car were gone, and the apartment was dark. The only sign of life in the apartment was Sarah's pet cat, which came to the glass door and cried.

On the morning of Saturday, November 20, 2004, the Powers went back to Sarah's apartment. Sarah's car was still missing, and her cat was still at the door, crying. Mrs. Powers called Sarah's salon to see if she had arrived at her hair appointment on Saturday morning and was told she had not. The Powers made the fifty-minute round trip from their home to Sarah's apartment three more times on Saturday. Each time they returned, Sarah's cat cried and clawed at the door. The last

---

[3] Records from Sarah's cell phone revealed that Sarah called Crawford twice on November 19, 2004, once at 7:52 a.m. and again at 8:52 a.m.

time the Powers went to Sarah's apartment on Saturday evening was around 8:00 p.m. They found a bottle of wine at the door with a note that said, "Sarah, sorry I missed you. Call me to let me know you're okay." Sarah had missed her Saturday afternoon date.

On Sunday, November 21, 2004, the Powers were finally able to reach Sarah's landlord, who let them into her apartment. The first thing the Powers noticed was that her cat had no food or water. The Powers had taken care of Sarah's cat when she had gone out of town before, and it was uncharacteristic for Sarah to leave her pet unattended and without food or water. After taking care of the cat, the Powers began looking around Sarah's apartment to try to determine what had happened. Mrs. Powers noted that all of Sarah's luggage was still in the apartment and that the clothes she had worn to dinner on Thursday were on the floor in front of her washing machine. Mrs. Powers went to Sarah's bedroom and noticed that there was a book open to page fifty-nine lying face down on Sarah's bedside table entitled, "It's My Life Now: Starting Over After an Abusive Relationship or Domestic Violence."

In the early morning hours of November 22, 2004, the night manager of a motel in Charlottesville, Virginia found Sarah dead in one of the motel's rooms, her body positioned in a particularly gruesome and suggestive manner. Stripped naked,

Sarah was placed on the bed in a "frog-like position." A motel towel concealed a fatal gunshot wound to the right side of her chest. An assistant chief medical examiner for the Commonwealth determined that the bullet passed through Sarah's right lung and severed her spinal cord, rendering Sarah paralyzed, unable to walk or struggle. The medical examiner testified that, without medical treatment, Sarah could have lived up to an hour following such an injury. Investigators found seminal fluid in Sarah's vagina and spermatozoa in Sarah's mouth and anus. DNA recovered from the seminal fluid matched that of Crawford. In addition, investigators found Crawford's clothing, personal belongings, and fingerprints in the motel room. Cigarette butts in the motel room's ashtray contained Crawford's DNA, and a pill bottle bearing Crawford's name was also found in the room. The motel's clerk testified that Crawford arrived at the motel at 11:00 a.m. on November 19, 2004. Crawford was driving Sarah's car at the time[4] and parked in the farthest spot from the front desk. Crawford told the clerk that he had been driving all night and asked for a quiet room, which he paid for with a $100 bill.

---

[4] Although characterized by the Powers and other witnesses as "Sarah's car," the evidence adduced at trial established that the vehicle Crawford was driving actually belonged to Mr. Powers.

Given the abundance of evidence linking him to the murder scene, the Charlottesville police began to search for Crawford. As part of that investigation, the police contacted Crawford's relatives. Crawford's adult daughter, who lived in South Carolina, reported that her father had contacted her recently and asked her to wire him money. With this information, the police then learned that Crawford was staying with his extended family in Jacksonville, Florida.

The Charlottesville police informed their Jacksonville colleagues that they had reason to believe Crawford was in their area and that there was an outstanding warrant for his arrest for the murder of Sarah. The Charlottesville police also advised the Jacksonville authorities that Crawford was likely driving Sarah's car. The Jacksonville police located Crawford and arrested him; they also seized Sarah's car (which Crawford was driving at the time of his arrest) and sealed it for evidentiary purposes. The Charlottesville police later processed the car for evidence. The driver's window of the vehicle was broken, and police found Sarah's blood on both the driver's and rear seats. The police found gunshot residue in the car and a box of ammunition in the trunk.

Crawford waived his Miranda rights and made a statement to the Florida police during a custodial interview. The interview was videotaped, and the recording was admitted into evidence at

trial. Crawford claimed that Sarah had picked him up early Friday morning at his house. He said they had planned to go to Charlottesville for the weekend to attempt to reconcile. After an hour to an hour and a half drive, they arrived in Charlottesville at about 8:30 in the morning. Sarah was driving, and he was in the passenger's seat. Crawford said they drove directly to a McDonalds and got breakfast.[5] Without any explanation as to why, Crawford then stated that he pulled out his .38 caliber revolver[6] planning to commit suicide. Crawford said he had the gun cocked and his finger on the trigger when Sarah grabbed for the weapon. While they were wrestling over the gun, it went off and the bullet hit Sarah. Crawford claimed the shooting was an accident, telling the police "she basically did it to herself."

Crawford then said that he pulled Sarah into the back seat and drove to a nearby hotel and rented a room. He left Sarah's body on the bed and her clothing in the room and "took off and headed south." Significantly, Crawford never offered any explanation for leaving Sarah's body undressed in the position

---

[5] The autopsy report, which was admitted into evidence, described the contents of Sarah's stomach as "a scant amount (20cc) of thin yellow fluid."

[6] The police learned that on November 6, 2004, Crawford purchased a .38 caliber Smith & Wesson revolver. He later purchased a box of .38 caliber ammunition on November 13, 2004. Although Crawford disposed of his revolver, police found a box of ammunition in his possession after Sarah was shot and killed. Two cartridges were missing from the box.

in which it was found, nor for failing to seek medical help for Sarah. Likewise, he offered no explanation as to why his semen was found in her vagina and sperm was found in her mouth and anus.[7]

Prior to trial, Crawford made a motion to suppress the affidavit executed by Sarah in support of the protective order, arguing that the document was testimonial hearsay and, therefore, inadmissible under Crawford v. Washington, 541 U.S. 36 (2004). During the suppression hearing, the Commonwealth did not dispute that the affidavit was testimonial hearsay. Instead, the Commonwealth argued that under the doctrine of forfeiture by wrongdoing, the trial court should find that Crawford forfeited his right to confrontation with respect to statements by Sarah. The trial court agreed with the Commonwealth and admitted a redacted copy of the affidavit on those grounds. A jury subsequently convicted Crawford of capital murder, abduction with intent to defile, rape, grand larceny, use of a firearm in the commission of a murder, and use of a firearm in the commission of abduction. Crawford appealed his convictions to the Court of Appeals.

---

[7] Appellant's brief filed in the Court of Appeals stated that, "[d]uring the course of their travel [from Manassas to Charlottesville] they engaged in consensual intercourse." The record is totally devoid of any evidence to support this assertion.

12

In the Court of Appeals, Crawford contended that the trial court erred in (1) denying his motion to suppress an affidavit made by Sarah Crawford, which was submitted to the JDR court in conjunction with her application for a preliminary protective order and (2) failing to grant his motion to strike the charges of abduction with intent to defile and rape, "since there was insufficient evidence to permit these issues to go to the jury."

On December 23, 2008, a divided panel of the Court of Appeals reversed all of Crawford's convictions with the exception of his conviction for grand larceny. See Crawford v. Commonwealth, 53 Va. App. 138, 163, 670 S.E.2d 15, 27 (2008). The panel majority held that the trial court's admission of the affidavit violated Crawford's rights under the Confrontation Clause. Id. at 151, 670 S.E.2d at 21. The majority further held that the evidence was insufficient to support Crawford's convictions for rape, abduction with intent to defile, and use of a firearm in the commission of abduction. Id. at 163, 670 S.E.2d at 27. The majority also reversed Crawford's conviction for capital murder, since it reversed the convictions on which the capital murder charge was based. Id. at 163-64, 670 S.E.2d at 27. The panel dissent disagreed with the majority only in its sufficiency analysis as to the charge of abduction with

13

intent to defile.  Id. at 166, 670 S.E.2d at 28-29 (Beales, J., concurring in part and dissenting in part).

The Commonwealth petitioned the full Court of Appeals for a rehearing en banc and the Court of Appeals granted the petition.  Crawford v. Commonwealth, 53 Va. App. 349, 349, 671 S.E.2d 436, 437 (2009).  Upon rehearing en banc, the Court of Appeals affirmed all of Crawford's convictions in the trial court.  Crawford v. Commonwealth, 55 Va. App. 457, 482, 686 S.E.2d 557, 569 (2009).

Crawford timely filed his notice of appeal and we granted an appeal on the following assignments of error:

1.  The Court of Appeals erred in holding that an affidavit in support of an ex parte petition for a protective order is not "testimonial" within the meaning of Confrontation Clause cases, in violation of Anthony Crawford's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

2.  The Court of Appeals erred in holding that the principle of "forfeiture by wrongdoing" applies to permit extra-judicial statements in cases that arise in domestic relations contexts, even without specific proof in this case that the Defendant killed the victim to silence her or to keep her from testifying against him, in violation of Anthony Crawford's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

3.  The Court of Appeals erred in holding that the Court of Appeals is not bound by the trial court's ruling and the prosecutor's concession that the affidavit was "testimonial."

14

4. The Court of Appeals erred in applying the "right result/wrong reason" doctrine to uphold the conviction.

5. The Court of Appeals erred in failing to address Appellant's argument that the evidence was insufficient to sustain the convictions of abduction with intent to defile and rape.

## II. Analysis

### A. Standard of Review

On appeal, constitutional arguments present questions of law that this Court reviews de novo. Shivaee v. Commonwealth, 270 Va. 112, 119, 613 S.E.2d 570, 574 (2005). Additional well-established principles of appellate review guide this Court's analysis. "We consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial." Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000) (citing Reid v. Commonwealth, 256 Va. 561, 564, 506 S.E.2d 787, 789 (1998)).

### B. Testimonial Nature of the Affidavit

The Confrontation Clause of the Sixth Amendment to the U.S. Constitution, made applicable to the States by the Fourteenth Amendment, Pointer v. Texas, 380 U.S. 400, 403 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v.

15

Washington, the United States Supreme Court held that the Confrontation Clause does not allow the admission of testimonial statements of a witness who did not appear at trial "unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54. The Court stated, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Id. at 68-69.

If the statement is found to be testimonial, "the Sixth Amendment demands what the common law required: [in-court confrontation or] unavailability and a prior opportunity for cross-examination." Id. at 68. Significantly, the Court declared that the "core class of 'testimonial' statements" include:

> ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

16

Id. at 51-52 (internal quotation marks and citations omitted) (emphasis added).

In Davis v. Washington, 547 U.S. 813, 822 (2006), the Supreme Court further clarified what constitutes a "testimonial" statement:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

As explained in Davis, a statement is nontestimonial if it is made in the context of an ongoing emergency and is given for the purposes of resolving that emergency. Id. By contrast, a statement is testimonial if it is given while "[t]here was no emergency in progress," id. at 829, and is made for the purpose of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." Id. at 822 (emphasis added).

In this case, Sarah executed an affidavit for use in an ex parte court proceeding, and given the nature of the statements themselves, which describe violent, criminal acts, an objective witness would reasonably "believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 52.

17

Additionally, Sarah's statements were not made in the context of an ongoing emergency in order to enable police to help resolve that ongoing emergency.  Instead, Sarah's affidavit described past events that had taken place days, weeks, and even months previously--the very purpose of which was to "establish or prove past events potentially relevant to later criminal prosecution."  Davis, 547 U.S. at 822.  Despite the fact that the immediate purpose of the affidavit was to obtain a protective order in a civil case, the facts recited were, nonetheless, "potentially relevant to later criminal prosecution."

Most recently, the Supreme Court held in Melendez-Diaz v. Massachusetts, 557 U.S. ___, ___, 129 S.Ct. 2527, 2532 (2009), that affidavits (or certificates of analysis in that case) related to forensic laboratory tests are testimonial.  In so holding, the Supreme Court stated:

> There is little doubt that the documents at issue in this case fall within the 'core class of testimonial statements' thus described.  Our description of that category mentions affidavits twice.  See also White v. Illinois, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in judgment) ("[T]he Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions").  The documents at issue here, while denominated by Massachusetts law 'certificates,' are quite plainly affidavits: 'declaration[s] of facts

written down and sworn to by the declarant before an officer authorized to administer oaths.' Black's Law Dictionary 62 (8th ed. 2004). They are incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.' Crawford, [541 U.S.] at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). . . . The 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' Davis v. Washington, 547 U.S. [at] 830.

Id.

Given the Supreme Court's definition and examples of testimonial statements in Crawford, Davis, and Melendez-Diaz, we hold that the affidavit in support of Sarah Crawford's petition for a preliminary protective order is testimonial in nature and should not have been admitted against Crawford at trial. Because Sarah was unavailable to testify at Crawford's trial and Crawford did not have a prior opportunity to cross-examine Sarah concerning these statements, Crawford's Sixth Amendment right to confrontation was violated when the affidavit was admitted into evidence against him at trial. Accordingly, the Court of Appeals erred when it held the affidavit to be nontestimonial and upheld its admission at Crawford's trial.

However, this conclusion does not end our analysis. The Commonwealth argues that the admission of the affidavit in

19

Crawford's trial, if error, was harmless.  We agree with the Commonwealth.

## C.  Harmless Error

The United States Supreme Court has stressed on more than one occasion that, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).  Accordingly, the Supreme Court has "rejected the argument that all federal constitutional errors, regardless of their nature or the circumstances of the case, require reversal of a judgment of conviction." Id.  Therefore, "in the context of a particular case, certain constitutional errors, no less than other errors, may [be] 'harmless' in terms of their effect on the factfinding process at trial." Id.

Significantly, the Supreme Court has stated:

Whether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied. With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights. We have no hesitation in saying that the right[s] of these petitioners . . . expressly created by the Federal Constitution itself [are] federal right[s] which, in the absence of appropriate

20

> congressional action, it is our responsibility to protect by fashioning the necessary rule.

Chapman v. California, 386 U.S. 18, 21 (1967).  Accordingly, the Supreme Court has fashioned rules that this Court must apply when deciding whether errors committed in violation of a defendant's federal constitutionally guaranteed rights are harmless in nature.

In Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963), the Supreme Court declared that, in conducting a constitutional harmless error analysis, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."  The Supreme Court later clarified this rule when it stated that "[t]here is little, if any, difference between our statement in Fahy . . . and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  Chapman, 386 U.S. at 24 (emphasis added).  Consequently, the Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  Id.  The Court explained that this test "will provide a more workable standard, although achieving the same result as that aimed at in [Fahy]."  Id.

21

Significantly, the Supreme Court has held that error involving the Sixth Amendment's Confrontation Clause is subject to constitutional harmless error analysis. Van Arsdall, 475 U.S. at 684. In so holding, the Supreme Court further explained that "[t]he correct inquiry is whether, assuming that the damaging potential of the [error] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Id. Accordingly,

> [w]hether such an error is harmless in a
> particular case depends upon a host of factors,
> all readily accessible to reviewing courts.
> These factors include the importance of the
> [tainted evidence] in the prosecution's case,
> whether [that evidence] was cumulative, the
> presence or absence of evidence corroborating or
> contradicting the [tainted evidence] on material
> points . . . and, of course, the overall strength
> of the prosecution's case."

Id.; Cypress v. Commonwealth, 280 Va. 305, 318-19, 699 S.E.2d 206, 213-14 (2010).

Specifically, Sarah's affidavit described several instances of Crawford's abuse and violence towards her, including episodes where Crawford picked Sarah up and threw her against a door; episodes where he would break things and where he threw a glass and other items at her; where he pushed her down; and an episode where he falsely accused her of forging a prescription. The affidavit also included various threats made by Crawford against Sarah, and the statement made by Sarah

22

that, "I am afraid of [Crawford]. I fear he may physically hurt me or even kill me. I want him to stay away from me and my family." Lastly, the affidavit included a description of an incident in which Crawford had raped her less than three months earlier.

The overall strength of the Commonwealth's case against Crawford, and the quantum, character, and quality of the other evidence introduced at trial, independent of the affidavit, is overwhelming. The affidavit is simply cumulative of other evidence relating to these charges properly before the jury. Upon considering the factors outlined in Van Arsdall, 475 U.S. at 684, including "the importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points [and] the overall strength of the prosecution's case," we hold that the admission of the affidavit constitutes harmless error beyond a reasonable doubt in relation to Crawford's convictions for capital murder, abduction with intent to defile, rape, use of a firearm in the commission of a murder, use of a firearm in the commission of an abduction, and grand larceny.

i. Abduction with Intent to Defile

The evidence introduced at trial, independent of the affidavit, overwhelmingly demonstrates that admission of the

23

affidavit was harmless beyond a reasonable doubt in relation to the abduction with intent to defile conviction--a predicate offense for the capital murder conviction.

Code § 18.2-48 states in relevant part, "[a]bduction . . . of any person with intent to defile such person . . . shall be a Class 2 felony."  The crime incorporates the charge of abduction under Code § 18.2-47(A), which states:

> Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person, authority or institution lawfully entitled to his charge, shall be deemed guilty of "abduction."

The distinguishing feature between the charge of abduction and abduction with intent to defile is the specific intent required by the latter.  McKinley v. Commonwealth, 217 Va. 1, 4, 225 S.E.2d 352, 353 (1976).  Abduction with intent to defile is a more serious offense than abduction with intent only to deprive one of personal liberty.

In order to prove the greater offense of abduction with intent to defile, the evidence must show that Crawford abducted Sarah with the intent to sexually molest her.  Wilson v. Commonwealth, 249 Va. 95, 103, 452 S.E.2d 669, 675 (1995); see also Fitzgerald v. Commonwealth, 223 Va. 615, 632, 292 S.E.2d 798, 808 (1982) (holding that the terms "sexually molest" and

24

"defile" are interchangeable).  In <u>Wilson</u>, we upheld the defendant's conviction for abduction with intent to defile based on evidence showing that the victim was tied to her bed, arms and legs spread apart, with semen observed on her body. <u>Wilson</u>, 249 Va. at 99, 103-04, 452 S.E.2d at 673, 675.

Similarly, the evidence here, independent of the affidavit, was sufficient to show that Sarah did not voluntarily travel with Crawford, but rather that Crawford abducted her against her will.  Sarah had plans for a hair appointment and to go on a date with another man the weekend she disappeared. She also failed to report to work the day she disappeared, despite telling her supervisor she would be at work by 1:00 p.m.  Additionally, a box that belonged to Sarah's employer was found on the side of the road, with Sarah's blood on it, in Fauquier County on the morning Sarah disappeared. Sarah's supervisor testified that Sarah was supposed to ship that box for him.  Sarah's cell phone was also found on the side of the road in Manassas, Virginia that same morning. Records from Sarah's cell phone showed that Sarah called Crawford twice on the morning of November 19, 2004, once at 7:52 a.m. and once at 8:52 a.m.  Sarah did not appear to have packed anything, and she left all of her luggage at home.

Moreover, Crawford admitted that Sarah was shot inside her car.  The driver's-side window of Sarah's car was broken and

25

Sarah's blood was found on both the driver's and rear seats of the vehicle. Crawford also admitted that he took Sarah to a motel in Charlottesville and left her there alone after the shooting. An expert witness testified that Sarah could not move after she was shot because the bullet severed her spine. Consequently, she could not have gone to or entered the motel room on her own volition. The medical examiner testified that Sarah could have lived for an hour after she was shot. The medical examiner also testified that Sarah had several bruises, scratches, and abrasions on her neck and hands, injuries that Sarah's parents confirmed she did not have when they last saw her.

Additionally, several witnesses testified concerning Crawford's violent nature and Sarah's intense fear of him. Sarah's father testified that Crawford threw a table into the room and broke it when Sarah attempted to remove her belongings from the apartment she had shared with Crawford previously. This incident was described in detail in the affidavit. It was also offered into evidence through the testimony of Sarah's father, illustrating the merely cumulative nature of statements contained in Sarah's affidavit. Sarah's mother also testified that Crawford threatened Sarah when she moved out, telling her, "You'll pay for this." A police officer, who responded to the couple's home when Sarah was moving out, testified that

Crawford acted in an intimidating and overbearing manner, and appeared to threaten her. Sarah's supervisor and co-worker both testified about their knowledge of Sarah's fear of Crawford. Sarah's supervisor testified that he was not surprised to learn about the protective order against Crawford, given the "history between them."

Independent of the affidavit, the evidence, including the voluminous testimony and evidence demonstrating Crawford's history of violence and threats toward Sarah, the protective order, Sarah's plans for the weekend, the physical evidence of the box and her cell phone, Crawford's admission that Sarah was shot in her car, and the fact that she was paralyzed from the wound, overwhelmingly demonstrates, beyond a reasonable doubt, that Sarah did not go with Crawford willingly to Charlottesville and certainly did not go willingly from the car to the motel room.

Moreover, the evidence shows beyond a reasonable doubt that Crawford abducted Sarah with the intent to defile her. After she was shot, Crawford took Sarah directly to the motel room, completely undressed her and left her paralyzed on the bed, naked and positioned on her back with her thighs spread, in a sexually suggestive position. Crawford's semen was found inside Sarah's vagina, and sperm was found in or around Sarah's mouth and anus. Just as in Wilson, 249 Va. at 98-100, 103-04,

27

452 S.E.2d at 672-73, 675, this evidence alone is sufficient, independent of the affidavit, to conclude that Crawford abducted Sarah with the intent to defile her, particularly as Crawford was still in the process of abducting Sarah when he disrobed her and left her naked and paralyzed in the motel.

Significantly, the preliminary protective order admitted into evidence at trial without objection by Crawford informed the jury that a court had recently found "evidence sufficient to establish probable cause that family abuse, including forceful detention, resulting in physical injury to [Sarah] or placing [her] in reasonable apprehension of serious bodily injury," had "recently occurred."

Therefore, after considering the factors outlined in Van Arsdall, 475 U.S. at 684, including "the importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points [and] the overall strength of the prosecution's case," we hold that the admission of the affidavit constitutes harmless error beyond a reasonable doubt in relation to Crawford's conviction for abduction with intent to defile.

## ii.  Rape

We have consistently held that, " '[t]he burden is on the Commonwealth to prove every essential element of the offense

28

beyond a reasonable doubt.' This fundamental precept has been the bedrock of Virginia's criminal jurisprudence since the inception of this Commonwealth."  Bishop v. Commonwealth, 275 Va. 9, 13, 654 S.E.2d 906, 908 (2008) (quoting Powers v. Commonwealth, 211 Va. 386, 388, 177 S.E.2d 628, 629 (1970)). "Because of the stringent standard of proof the law imposes upon the prosecution, juries must acquit unless they find each element of the crime charged to have been proved beyond a reasonable doubt."  Ellison v. Commonwealth, 273 Va. 254, 257–58, 639 S.E.2d 209, 212 (2007).  We have observed that

> the burden of proof upon the [Commonwealth] in a
> criminal case was given constitutional status in
> In re Winship, 397 U.S. 358, 364 (1970) wherein
> the [United States Supreme] Court stated "that
> the Due Process Clause protects the accused
> against conviction except upon proof beyond a
> reasonable doubt of every fact necessary to
> constitute the crime with which he is charged."

Washington v. Commonwealth, 273 Va. 619, 623, 643 S.E.2d 485, 487 (2007).  In order to obtain a conviction against a defendant charged with a violation of Code § 18.2-61, therefore, the Commonwealth must prove beyond a reasonable doubt: (1) that the defendant had sexual intercourse with the victim; (2) that it was against her will and without her consent; and (3) that it was by force, threat or intimidation.[8]

---

[8] Although Code § 18.2-61 provides that sexual intercourse "through the use of the complaining witness's . . . physical helplessness" also constitutes rape, the instructions given to

29

<u>Gonzales v. Commonwealth</u>, 45 Va. App. 375, 382, 611 S.E.2d 616, 619 (2005); Code § 18.2-61(A).

The affidavit alleged that Crawford had raped Sarah earlier in their relationship. Describing the incident in detail, Sarah stated:

> I went to bed around 1 am. I notice [sic] [Crawford] was not in bed and I got up. I went out on the porch to smoke a cigarette. When I came back, I went to bed. He then came in and wanted sex. I did not want sex. He got mad and got up. I too got up and went to the bathroom. He then followed me in and said I was going to do what he tells me. He made me take a bath and also gave me an enema and made me dress up. He then made me dance for him. He would hit me in the head when he didn't like how I was dancing. He then got a belt and hit me three times on the thighs and butt. He then forced me to use a vibrator and he forced me to have sex with him.

The evidence, independent of the affidavit, overwhelmingly proves that Crawford raped Sarah the morning he abducted and killed her. Moreover, the allegations contained in the affidavit are cumulative of the evidence of substantial abuse suffered by Sarah at Crawford's hands, and serve simply to corroborate the overwhelming direct physical and circumstantial evidence, including that previously discussed.[9]

Cell phone records show that Sarah called Crawford at 8:52 a.m. on the morning of her death, indicating that they were not

---

the jury at Crawford's trial did not include this alternative element.

[9] <u>See</u> discussion <u>supra</u> Part II-C(i), regarding the abduction with intent to defile charge.

30

yet together.  Crawford admitted to taking Sarah from Northern Virginia to Charlottesville that same morning – a drive he said took an hour and a half.  The motel clerk testified that Crawford checked into the motel in Charlottesville (where Sarah's body was found) at approximately 11 o'clock that morning.  Crawford told police that Sarah was shot in her car in Charlottesville; however, Sarah's blood was found on a box in Northern Virginia.  Crawford told police that he took Sarah directly to the motel after she was shot, rather than to a hospital.  Crawford then stripped Sarah completely of her clothing.  He positioned her nude on her back, on the bed, with her thighs spread.  Crawford's semen was found inside Sarah's vagina and sperm was found in or around her mouth and anus.  Additionally, the testimony of multiple witnesses indicated that, at the time of her disappearance, Sarah was deeply afraid of Crawford.  The medical examiner also testified that Sarah had several bruises, scratches, and abrasions on her neck and hands, injuries that Sarah's parents confirmed she did not have the night before Crawford abducted and killed her.

Considered as a whole, the evidence shows beyond a reasonable doubt that Sarah did not engage in consensual sexual contact with Crawford on the morning that he killed her, particularly given that expert testimony indicated that she would have been paralyzed after having been shot.  Furthermore,

31

while the affidavit did contain the allegation that Crawford had previously raped Sarah, it was merely cumulative of the mountain of other evidence indicating the horrible and abusive nature of their relationship, and corroborative of the direct physical and circumstantial evidence indicating that Crawford raped Sarah after he shot her on the morning of her death, November 19, 2004.

Therefore, after considering the necessary factors outlined in Van Arsdall, 475 U.S. at 684, including "the importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points [and] the overall strength of the prosecution's case," as it relates to this particular charge, we hold that the admission of the affidavit constitutes harmless error beyond a reasonable doubt in relation to Crawford's conviction for rape.

### iii. Capital Murder

Crawford was charged with one count of capital murder with two possible predicate offenses stated in the disjunctive. The indictment charging capital murder read, in pertinent part, as follows: "CRAWFORD . . . did willfully, deliberately and with premeditation, kill and murder Sara [sic] Crawford during the commission of an abduction with intent to defile or during the

32

commission of or subsequent to rape, forcible sodomy or object sexual penetration." (Emphasis added.) The jury instruction on this issue stated in pertinent part:

> The defendant is charged with the crime of capital murder. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime: . . .

> [3] T]hat the killing occurred in the commission of the abduction with intent to defile Sarah Crawford <u>or</u> that the killing occurred in the commission of the rape of Sarah Crawford.

(Emphasis added.) Consequently, while Crawford was only charged with one count of capital murder, the jury had the opportunity to convict him of capital murder based upon both predicate offenses (abduction with intent to defile <u>and</u> the rape of Sarah Crawford) or based upon either abduction with intent to defile <u>or</u> rape, independently. The jury ultimately found the capital murder conviction to be based upon both predicates. The verdict form that was rendered by the jury stated: "We, the jury, find the defendant, Anthony Dale Crawford, guilty of the willful, deliberate and premeditated killing of Sarah Crawford in the commission of abduction with intent to defile Sarah Crawford <u>and</u> in the commission of the rape of Sarah Crawford." (Emphasis added.)

The evidence in the record, independent of the affidavit, demonstrates that admission of the affidavit was harmless beyond a reasonable doubt in relation to Crawford's conviction

33

for capital murder, based upon the predicate offenses that the killing occurred in the commission of the abduction with the intent to defile Sarah Crawford and in the commission of the rape of Sarah Crawford.

The affidavit did relate incidents when Crawford had been violent towards Sarah in the past and had threatened her. However, the record, independent of the affidavit, demonstrates Crawford's abuse, violence, and threats toward Sarah.  As mentioned above, the preliminary protective order itself, admitted into evidence at trial without objection, declared that "[t]here is evidence sufficient to establish probable cause that family abuse, including forceful detention, resulting in physical injury to [Sarah] or placing [her] in reasonable apprehension of serious bodily injury," had "recently occurred."  Furthermore, several witnesses testified concerning Crawford's violent, abusive nature, and Sarah's intense fear of him.  Considering the voluminous evidence demonstrating Crawford's history of violence and threats toward Sarah, the affidavit's allegations of violence and threats were merely cumulative in nature.

Additionally, the evidence, apart from the affidavit, proved that Crawford purchased a gun and ammunition just days prior to shooting Sarah.  Crawford admitted that he shot his wife and that he took her to the motel room after shooting her.

34

Crawford claimed that he shot her accidentally, but rather than taking Sarah to a hospital, he attempted to cover up this "accident." After he shot her, Crawford drove to a motel and left Sarah alone in one of its rooms. According to expert testimony, even if Sarah were alive when Crawford left her in that room, she would not have been able to move to seek help. After leaving Sarah alone and immobile in the motel room, Crawford did not call anyone for help. Instead, he took Sarah's car and drove to Florida to visit relatives who did not know he was coming. He did not mention the "accident" to them, and Crawford's extended family testified that he acted normally during his time in Florida and that he did not seem "morose or sad" about anything. The jury was entitled to disbelieve Crawford's implausible account of the shooting.

Accordingly, upon review of the record, and after considering the factors outlined in Van Arsdall, 475 U.S. at 684, including "the importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points [and] the overall strength of the prosecution's case," we conclude that the affidavit was merely cumulative of other evidence properly before the jury; therefore, we hold that the admission of the affidavit constitutes harmless error beyond a reasonable doubt

in relation to Crawford's conviction for capital murder, based upon the predicate offenses of abduction with the intent to defile and rape.

### iv.  Grand Larceny

Clearly, the admission of the affidavit was harmless beyond a reasonable doubt in relation to Crawford's conviction for grand larceny.  Crawford's conviction for grand larceny required proof that he "wrongful[ly] or fraudulent[ly] [took] another's property [valued at $200 or more] without [the owner's] permission and with the intent to deprive the owner of that property permanently."  Tarpley v. Commonwealth, 261 Va. 251, 256, 542 S.E.2d 761, 763-64 (2001).  See also Code § 18.2-95.  Crawford was found in possession of Sarah's vehicle, without her permission, and he admitted in his statement to the police that he drove it to Florida.  The car was titled in Mr. Powers' (Sarah's father) name and he testified that he had purchased the car for his daughter.  Additionally, Mr. Powers testified that at the time Crawford stole Sarah's car, it was worth approximately fifteen thousand dollars ($15,000).

The affidavit simply does not contain any information, whatsoever, relevant to Crawford's conviction for grand larceny, and the independent evidence proved that Crawford was guilty of grand larceny.  As such, admission of the affidavit

constitutes harmless error beyond a reasonable doubt in relation to Crawford's conviction for grand larceny.

v. Use of a Firearm Convictions

The admission of the affidavit was harmless beyond a reasonable doubt in relation to Crawford's two firearms convictions. Code § 18.2-53.1 provides that, "[i]t shall be unlawful for any person to use . . . any pistol, shotgun, rifle, or other firearm or display such weapon . . . while committing or attempting to commit murder . . . or abduction." Just as with the grand larceny charge, the affidavit simply makes no allegation, whatsoever, having anything to do with a firearm or Crawford's use or possession of any firearm. The evidence did show, independent of the affidavit, however, that Crawford purchased a gun just prior to the killing. Crawford admitted that he had a gun on the day of Sarah's disappearance and death. Crawford even admitted to shooting Sarah, although he claimed it was accidental. Accordingly, we hold that admission of the affidavit was harmless error beyond a reasonable doubt in relation to Crawford's use of a firearm convictions.

D. The "Forfeiture by Wrongdoing" Doctrine

The Commonwealth argues that even if the affidavit is testimonial in nature, nonetheless, it is admissible under the doctrine of "forfeiture by wrongdoing." The Court of Appeals

37

discussed what it referred to as the "possibility," left open by the United States Supreme Court in Giles v. California, 554 U.S. 353, 128 S.Ct. 2678 (2008), "that a defendant's intention to prevent testimony might be inferred from the surrounding circumstances, such as in a case of ongoing domestic violence." Crawford, 55 Va. App. at 473, 686 S.E.2d at 564. The United States Supreme Court specifically discussed this possibility in Giles:

> Where such an abusive [domestic] relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution – rendering her prior statements admissible under the forfeiture doctrine.

Giles, 554 U.S. at ___, 128 S.Ct. at 2693 (emphasis added).

Ultimately, the Court of Appeals concluded that the trial court neither made the requisite factual findings showing Crawford's intent to prevent Sarah from testifying against him, nor did the court consider the specific domestic violence factors discussed in Giles which may evidence such an intent. Crawford, 55 Va. App. at 482, 686 S.E.2d at 569. Accordingly, the Court of Appeals held that, "[b]y not considering Crawford's intent, the trial court incorrectly applied the forfeiture by wrongdoing doctrine, as it was defined in Giles. Thus, the trial court erred in its analysis for admitting the

38

affidavit on that basis." Crawford, 55 Va. App. at 474, 686

S.E.2d at 565.  We agree with the Court of Appeals.

E.  The Commonwealth's Concession and
"Right Result for the Wrong Reason"

In separate assignments of error, Crawford maintains that:

(1) the Court of Appeals erred by holding it was not bound by

the Commonwealth's concession at trial that the affidavit was

"testimonial;" and (2) the Court of Appeals erred in applying

the "right result/wrong reason" doctrine.  Because we hold that

the affidavit was testimonial in nature, it is unnecessary to

address either of these assignments of error.

F.  Sufficiency of the Evidence

Crawford maintains that the evidence was insufficient to

convict him of abduction with intent to defile and rape.  As we

have previously held:

> When considering a challenge to the sufficiency
> of the evidence to sustain a conviction, this
> Court reviews "the evidence in the light most
> favorable to the prevailing party at trial and
> consider[s] all inferences fairly deducible from
> that evidence." Jones v. Commonwealth, 276 Va.
> 121, 124, 661 S.E.2d 412, 414 (2008).  This
> Court will only reverse the judgment of the
> trial court if the judgment "is plainly wrong or
> without evidence to support it." Wilson v.
> Commonwealth, 272 Va. 19, 27, 630 S.E.2d 326,
> 330 (2006) (quoting Code § 8.01-680).  "If there
> is evidence to support the convictions, the
> reviewing court is not permitted to substitute
> its own judgment, even if its opinion might
> differ from the conclusions reached by the
> finder of fact at the trial." Commonwealth v.

39

> *Jenkins*, 255 Va. 516, 520, 499 S.E.2d 263, 265
> (1998).

*Clark v. Commonwealth*, 279 Va. 636, 640-41, 691 S.E.2d 786, 788 (2010). Additionally, we have held that when an appellate court is reviewing the sufficiency of the evidence, "[a]ny evidence properly admitted at trial is subject to this review." *Commonwealth v. Presley*, 256 Va. 465, 467, 507 S.E.2d 72, 72 (1998) (citing *Commonwealth v. Jenkins*, 255 Va. 516, 521, 499 S.E.2d 263, 265 (1998)) (emphasis added). As such, an appellate court may not consider evidence illegally admitted at trial. To hold otherwise would circumvent on appeal the Constitutional protections provided to a defendant at trial.

The Court of Appeals held that counsel for Crawford "conceded that, if the affidavit were admissible, the evidence was sufficient to convict him of abduction with intent to defile and rape." *Crawford*, 55 Va. App. at 481, 686 S.E.2d at 569 (emphasis added). The Court of Appeals found this concession to qualify "either as a waiver for purposes of Rule 5A:18 or as an express withdrawal of an appellate challenge to a trial court judgment." *Id.* Because the affidavit was improperly admitted, however, and because Crawford did not concede that the evidence was sufficient to convict him of abduction with intent to

40

defile and rape without the affidavit, Crawford did not waive this assignment of error. Accordingly, the Court of Appeals erred in failing to address Crawford's sufficiency argument.

After reviewing "the evidence in the light most favorable to [the Commonwealth,] the prevailing party at trial[,] and consider[ing] all inferences fairly deducible from that evidence," Clark, 279 Va. at 640-41, 691 S.E.2d at 788 (quoting Jones v. Commonwealth, 276 Va. 121, 124, 661 S.E.2d 412, 414 (2008)), we hold that the evidence, independent of the affidavit, is sufficient to support the jury verdict finding Crawford guilty of abduction with intent to defile and rape for the same reasons that the admission of the affidavit was harmless error beyond a reasonable doubt, above.

### III. Conclusion

We hold that the admission of the affidavit into evidence at trial, although violative of Crawford's Sixth Amendment right to confrontation, was harmless beyond a reasonable doubt for each of Crawford's convictions. Additionally, we hold that the evidence was sufficient to sustain the convictions for abduction with intent to defile and rape. Accordingly, albeit based upon different analysis, we will affirm the judgment of the Court of Appeals of Virginia, which affirmed Crawford's convictions for capital murder, abduction with intent to

41

defile, rape, use of a firearm in the commission of a murder, use of a firearm in the commission of an abduction, and grand larceny.

<u>Affirmed.</u>