COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys,[*] Friedman and White
Argued at Christiansburg, Virginia

UNPUBLISHED

TIMOTHY LEE COLES

MEMORANDUM OPINION[**] BY
v.      Record No. 0110-23-3          JUDGE FRANK K. FRIEDMAN
                                      FEBRUARY 27, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge

(Elmer Woodard, on brief), for appellant. Appellant submitting on
brief.

Stephen J. Sovinsky, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Pittsylvania County convicted Timothy Lee

Coles of possession of ammunition after having been convicted of a felony, possession of

cocaine with the intent to distribute (third or subsequent offense), possession of a firearm while

possessing drugs, and possession of a firearm after having been convicted of a felony. The trial

court sentenced Coles to a total of 39 years of incarceration with 19 years suspended. On appeal,

Coles challenges the admission of a witness's out-of-court statements and the sufficiency of the

evidence supporting his convictions. For the following reasons, we affirm the trial court's

judgment.

---

[*] Judge Humphreys participated in the hearing and decision of this case prior to the
effective date of his retirement on December 31, 2023.

[**] This opinion is not designated for publication. *See* Code § 17.1-413(A).

# BACKGROUND[1]

## I. Events Leading Up to Coles's Arrest and Trial

### A. Coles's Actions Underpinning the Drug and Weapons Charges

On May 27, 2019, Pittsylvania County police officers responded to a call on Straightstone Road regarding a partially clothed woman yelling for help underneath a mobile home. When the police arrived, they found Alethea Bagby, dirty and distressed. At trial, Bagby testified that she and a friend, Maria Graham, met up with two men at a house. Coles was one of those men. Bagby testified that while she and Graham were at the house, Coles began complaining that he "was missing" his drugs, specifically crack cocaine, and that Coles made the two women "strip naked." "Then [Coles] pulled out a gun and he said he was going to kill [them], and he shot his gun" in the air "right in front of [them]." Coles said, "it was going to be three dead bodies down here if I don't find my stuff." Bagby was "somehow" able to get away and hide under the next-door neighbor's mobile home. She hid under the mobile home for an hour and a half. Bagby also told the police that Coles was driving "a gray F150 with big wheels on it."

As they were leaving the scene, the deputies passed a gray F150 "with the big shiny wheels" on Straightstone Road. All three marked law-enforcement vehicles turned around and followed the F150; Deputy Landrum attempted to effect a traffic stop. The F150 turned onto another road and, as Deputy Landrum turned to follow, he saw the F150 sitting on the side of the road. As Deputy Landrum drove closer to the truck, the F150 pulled off and continued driving in the same direction it had been going before. Instead of following the F150, Deputy Landrum stopped his vehicle because he saw a woman lying face down where the truck had been stopped.

---

[1] "In accordance with familiar principles of appellate review, we recite the facts in the light most favorable to the Commonwealth, as the prevailing party at trial." *Brown v. Commonwealth*, 75 Va. App. 388, 398 n.5 (2022).

The other deputies continued following the truck but were not able to effect a traffic stop because they could not catch up to the F150.

The woman lying on the side of the road was Graham, who was not wearing any shoes. Graham later told the deputy she had been wearing slip-on shoes which were not with her. There was also a large black travel bag lying near Graham. Inside the bag, the deputies discovered two ounces of crack cocaine, marijuana, "eight round white pills," "twelve blue pills," "six hundred dollars in currency," digital scales, and other paraphernalia.[2] Graham indicated that Coles had thrown a handgun out of the truck's driver-side window.

While the officers were attending to Graham, the same gray F150 passed by going in the opposite direction. Deputy Samuels pursued the vehicle and effected a traffic stop. The deputy identified Timothy Coles[3] as the driver of the F150. Deputy Samuels discovered a live ammunition round on the "running board" (or "step rail") of Coles's truck. Deputy Samuels asked Coles to step out of the vehicle, and the deputy observed "another ammo round identical to the one that was on the running board, right there at the driver's seat."

The officers arrested Coles later that same day and "three more nine millimeter [sic] bullets" were discovered in his pockets. Deputy Landrum found additional paraphernalia in the center console of the F150 and more currency ($251) under the driver's side floor mat. Graham's slip-on shoes and a cellphone belonging to Coles were also found inside the truck. The next day, other officers returned to where Graham was found and discovered a firearm loaded with nine-millimeter ammunition in the chamber and magazine.

---

[2] During the trial, Deputy Samuels identified the drugs and paraphernalia as being inconsistent with personal use when considered all together.

[3] Coles had four prior distribution of cocaine convictions.

- 3 -

B. Graham Makes a Statement to the Police.

Later that same day, Deputy Talbard took a statement from Graham while she was being treated at the hospital. The deputy wrote out the statement as Graham recounted the events. The signed statement reads, in pertinent part:

> I hit Alethea Bagby on messenger to tell her Happy Memorial Day and see what she was going to do for the night. []She (Alethea) said nothing and then she called me and she asked me what I was doing[,] and I said I was going to hang out with a friend and I asked her if she wanted to go[,] and she stated ["]yea.["] Alethea asked me where I was at so she could pick me up. Alethea picked me up on Campbell Ave while I was walking and we went to the new gas station in Altavista to meet "Tim Coles" and "Kramer." Me [sic] and Alethea followed "Tim" to "Kramer's" house on Straightstone. Me [sic] and Alethea went into "Kramer's" house to wait for "Tim" and "Kramer" to come inside. Seven minutes later they came into the house. Me [sic] and Tim were conversing about houses to move into. . . . So Tim started looking in his pockets for crack. Tim couldn't find the crack in his pockets. Tim went outside to look and he didn't find his crack. Tim came back into the house and accused me and Alethea for having his crack that he couldn't find. Tim stated to me and Alethea [sic] "was not leaving until his crack came up." Tim made me and Alethea strip naked. Me [sic] and Alethea kept telling Tim we did not have his crack. So then Tim stated to us "ok hold on I got something for you." Tim went outside to his truck and me [sic] and Alethea walked out behind him. Tim got a gun from the truck and put a clip in it and racked it. Tim told me, Alethea and Kramer "that we had five minutes to get his crack back to him." Me [sic], Alethea and Kramer began looking for the crack outside. Tim told Alethea he "didn't wanta hear nothing, he didn't care" because she (Alethea) was crying, begging him not to kill her[] because Tim stated "there was gonna be 3 dead bodies if his crack didn't show up." Tim shot 1 round in the air and stated "I'm not playing[.]" After that Alethea ran into the house and all she had on was a tank-top. Alethea went out the side door and I could hear her running through the grass. I went inside the house and seen [sic] the side door open and I walked out the side door to see if I could see Alethea. I didn't see her so I started walking across the yard towards the road. As I was walking[,] I was calling out for Alethea by name and she said "huh" and I said ["]where you at?["] [A]nd she said ["]I'm back here.["] I told her to come out but she wouldn't. So I started walking up the road and flagged a ride down. Two black males in a van stopped and as I opened the door to get in[,] Tim ran into the street and started shooting towards the

- 4 -

vehicle I got in.  The people that picked me up took me back to Campbell Ave where I got my brother to pay them $20 for bringing me there.  I then tried to contact Alethea and I couldn't get in touch with her.  Tim called me and asked me where I was at because he was coming to get me.  Tim was apologizing because misplaced [sic] his crack.  Tim came back to pick me up so we could go find Alethea.  When we got onto 501, I called Alethea and she answered and she said she was talking to the police because the people[']s trailer she was at called the police.  I asked her where she was going[] because I was on my way back to come check on her[] and to ride back to Lynchburg.  Alethea told me that not [sic] to call her no more [sic] because I was in the truck with "tim."  Me [sic] and Tim was [sic] on the way back to Kramer's to meet Alethea.  In the process[,] we passed the Police and Tim noticed that police were braking and had turned around.  Tim started driving faster and told me to jump out the truck [sic].  I kept telling Tim "No no no[."]  I didn't want to jump out the truck [sic] because I was scared.  Tim kept telling me ["]jump, go you gotta get out of truck.["]  Tim started to slow down and I opened the door and Tim sped up and I grabbed my black flower pouch and jumped out the truck[] [sic] and then Tim threw out a black bag behind me.  Before I jumped out the vehicle [sic] as we were turning on Level Run Rd[,] Tim threw out a gun.

No promises have been made to me and this statement is true and accurate to the best of my knowledge.

Statements from Graham were also included in Deputy Robert Landrum's police report: "Maria Graham . . . stated she was fine. . . .  She stated that she did not know anything about the black bag or the contents.  Later, Graham stated that . . . Timothy Coles had [thrown] the bag as she was forced out of the vehicle."  At trial, the Commonwealth introduced text messages retrieved from Coles's phone and Graham's above-noted signed statement, recounting the events of that evening.[4]  On the day of the incident, Bagby stated that she did not wish to pursue charges and signed a withdrawal of complaint form.

---

[4] The redacted police report was admitted over Coles's objection at trial.  An audio recording of Graham speaking with a Virginia Department of Corrections agent was also admitted into evidence over Coles's objection.

C. Coles Tells Graham to "put a zip on them lips."

Prior to the trial and while Coles and Graham were both incarcerated, Graham conducted a series of phone calls to Coles. The phone calls were recorded. Over the phone, over the course of several weeks, Graham and Coles discussed the subject case. On January 7, 2020, Coles told Graham "to zip that tongue[.]" On January 18, 2020, Coles told Graham that "they would've never caught me if you hadn't tell [sic] me to stop," and that all Graham had to "do is put a zip on them lips," and that without Graham, "they ain't got [him.]"

On January 25, 2020, Coles told Graham that all she had to do was "keep [her] mouth closed" and that the Commonwealth could not make Graham testify against her will. Coles went on to say to Graham, "[y]ou just keep your mouth closed, and you gonna be alright." In that same phone call, Coles references Deputy Landrum's police report, stating that "everything is in the police report." Coles also told Graham that she could "always say I recant my statement, I was delusional, I was absurd, I was scared, I don't know where it came from, it wasn't mine and it wasn't his." Coles informed Graham that "once this is over with . . . once I sue 'em, once it's all over with, and I sue 'em, then you can be straight."[5]

On January 30, 2020, Coles told Graham "if they try to subpoena you, all you have to do is remember this word right here: recant. R-E-C-A-N-T." Coles noted that "they already know you were under that you were under some kind of influence, so at the time you made those statements, you just say you were scared, you were petrified, you were scared of the police, that's all you got to do." At no time during any of the phone calls did Coles deny the truth of Graham's prior statements to the police or the contents of the police report.

---

[5] The Commonwealth viewed this exchange as an offer of pecuniary gain to Graham if she refused to cooperate with Coles's prosecution.

## II. Material Trial Court Proceedings

Prior to the trial, the Commonwealth filed two motions *in limine*. The Commonwealth argued that Coles actively persuaded Graham to recant her statement, to not comply with a subpoena, and to take any measure to ensure she did not testify and tell the court what she told deputies. The Commonwealth argued that Coles never denied the truth of Graham's statement, and instead, that he instructed Graham to conceal the truth. The Commonwealth claimed that based on Coles's actions, and because Coles failed to deny any of the information in the police report while talking to Graham on the telephone, he had acquiesced to the truth of those events. Thus, the Commonwealth argued, the police reports should be admitted during the trial because they fell under the adoptive admission exception of the Virginia Rules of Evidence.

In its second motion, the Commonwealth proffered that, after the phone calls between Coles and Graham, Graham called the Commonwealth Attorney's office stating that she did not want to testify and that she did not remember what happened. The Commonwealth argued that Coles's communications with Graham caused her to not want to testify against Coles in his trial. The Commonwealth further contended that, assuming Graham was unavailable to testify due to lack of memory, real or feigned, that Graham's written statement is admissible due to Coles's wrongdoing, including his offer of pecuniary gain after he sues Pittsylvania County. In sum, the Commonwealth argued that Coles had forfeited his right under the Sixth Amendment to confront Graham at trial due to his wrongdoing which led to her unavailability as a witness.

At the pre-trial hearing on the motions *in limine* the Commonwealth proffered that Coles had discussed the case with Graham on the phone. The Commonwealth further proffered that Graham had called Coles on three separate occasions and that during those phone calls Coles had told Graham not to testify against him. During the hearing, the defense asked that the calls be played for the record. Sometime after those conversations with Coles, Graham reached out to

the Commonwealth and voiced her desire to no longer testify against Coles.[6] The trial court granted the first motion *in limine* on the condition that the calls would be authenticated during the trial. The court took the second motion under advisement so the Commonwealth could establish unavailability of the witness.

During the jury trial, Graham was questioned outside the presence of the jury. Graham stated that she did not want to testify against Coles due to the possibility of self-incrimination and her lack of memory. Graham confirmed that Coles "knew [her] mom and [her family[.]" During cross examination, Graham agreed with defense counsel that the state had made threats to Graham of prosecution if she did not cooperate and that Coles did not make any threats towards her. Additionally, Graham answered "no" when asked: "Ms. Graham, your decision not to testify hasn't been procured or caused or brought about by anything that Mr. Coles said or did, is it?" After her testimony, the trial court found that Graham was refusing to testify and was therefore unavailable due to some wrongdoing by Coles. Thus, the court found that Graham was unavailable for purposes of forfeiture by wrongdoing. The various written and recorded statements of Graham were therefore presented to the jury. Portions of the recorded jail calls were also played to the jury at trial, including those between Graham and Coles.

Coles presented no evidence in his defense. In his motion to strike, Coles moved to strike only the cocaine possession charge and first firearm possession charge. As to the possession charge, Coles argued that the evidence was insufficient to establish intent to sell or distribute. As to the firearm charge, Coles argued that there were insufficient links establishing that Coles possessed the gun. The trial court denied the motion to strike. The jury entered a verdict of guilty on all charges. This appeal followed.

---

[6] On March 17, 2021, the Virginia Department of Corrections interviewed Graham. Graham stated to the Virginia Department of Corrections that she did not feel it was right for her to testify because Coles "knows my mom, where's my, where my family lives."

ANALYSIS

## I. Standards of Review

"On appeal, constitutional arguments present questions of law that this Court reviews de novo." *Crawford v. Commonwealth*, 281 Va. 84, 97 (2011). In conducting this analysis, the Court "consider[s] the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial." *Id.* (quoting *Bass v. Commonwealth*, 259 Va. 470, 475 (2000)). Further, it "is well established that violations of the Confrontation Clause . . . are subject to harmless error review." *Luginbyhl v. Commonwealth*, 48 Va. App. 58, 64 (2006) (en banc) (quoting *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004)).

"It is well-settled that decisions regarding the admissibility of evidence lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion." *Shanan v. Commonwealth*, 76 Va. App. 246, 255 (2022) (quoting *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021)).

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion

might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

II. Graham's Out-of-Court Statements Were Properly Admitted Based on the Factfinder's Conclusion that Coles Engaged in Efforts to Make Graham "Unavailable" to Testify

"[T]he Confrontation Clause bars the admission of testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination." *Cody v. Commonwealth*, 68 Va. App. 638, 666 (2018) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). The Supreme Court has noted two exceptions to a defendant's right to confront witnesses against him: dying declarations and forfeiture by wrongdoing. *Id.* (citing *Crawford*, 541 U.S. at 55-56 n.6; and *Reynolds v. United States*, 98 U.S. 145, 158-59 (1878)). "[T]he doctrine [of forfeiture by wrongdoing] permits the introduction of unconfronted testimonial statements 'only when the defendant engaged in conduct *designed* to prevent the witness from testifying.'" *Id.* (quoting *Giles v. California*, 554 U.S. 353, 360 (2008)). Specifically, the Commonwealth must show by a preponderance of evidence "the defendant intended to prevent a witness from testifying" and that the witness "is unavailable to testify at a defendant's criminal trial." *Id.* at 667 (citation and internal quotation marks omitted). Where a witness is physically available but "legally" unavailable to testify, "unavailability can only be determined when the witness is actually called to testify and, if they decline to do so, the reasons must be ascertained in the record." *Id.*

As a preliminary matter, the statements Graham made were testimonial because the primary purpose of the conversation was "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 658 (quoting *Ohio v. Clark*, 576 U.S. 237, 244 (2015)). Thus, the Confrontation Clause applies to Graham's statements and we must "determine whether the doctrine of forfeiture by wrongdoing permitted the admission of [Graham's] out-of-court statements

notwithstanding the Sixth Amendment's mandate that a defendant be provided the right to confront witnesses against him." *Id.* at 659 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

"[A] witness' out-of-court testimonial statement against a defendant is inadmissible 'unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination.'" *Id.* at 657 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009)). The forfeiture-by-wrongdoing exception "permits the introduction of unconfronted testimonial statements 'only when the defendant engaged in conduct *designed* to prevent the witness from testifying.'" *Id.* at 666 (quoting *Giles*, 554 U.S. at 360). "As a result, . . . pursuant to the doctrine of forfeiture by wrongdoing, 'unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying.'" *Id.* at 666-67 (quoting *Giles*, 554 U.S. at 361). "[F]orfeiture by wrongdoing *only* applies upon a showing by a preponderance of the evidence that a witness, whose out-of-court statements are at issue, is unavailable to testify at the defendant's criminal trial." *Id.* at 667. In *Cody*, the witness was "physically available but 'legally' unavailable for confrontation purposes." *Id.* Similarly, Graham refused to testify here *despite* being offered immunity. Having established that Graham was unavailable, the question becomes whether the Commonwealth established by a preponderance of the evidence that Coles intended to cause Graham to become "unavailable" within the meaning of the forfeiture doctrine and whether Coles's actions constitute "wrongdoing" as a matter of law. *Id.* at 667.

On appeal, Coles focuses on the witness's motivations by arguing that Graham contacted Coles, when the analysis instead requires that we examine Coles's intentions. *Id.* Over the phone, Coles stated to Graham "put a zip on them lips," "[y]ou just got to keep your mouth closed, and you're going to be all right," and "all you have to do is remember this word right

- 11 -

here, recant. R-E-C-A-N-T."[7] The trial court correctly found that "forfeiture by wrongdoing may include the defendant's collusion with a witness to ensure that witness will not . . . be heard at trial. And that's what the Commonwealth has laid out with its evidence today, over and over and over . . . ."

Coles's actions fall within the broad category of wrongdoing applicable to the forfeiture by wrongdoing doctrine. *See United States v. Jackson*, 706 F.3d 264, 268-69 (4th Cir. 2013) (holding that forfeiture-by-wrongdoing exception should be construed broadly because otherwise defendants would have an "intolerable incentive" to bribe, intimidate, or harm witnesses). And, when conducting the forfeiture-by-wrongdoing analysis, the trial court was entitled to consider Coles's statements to Graham. Although Coles did not make any direct threats "towards [her]," Graham was afraid of Coles and didn't know what he was capable of, and stated that he "knows my mom, where's [sic] my, where my family lives." In sum, the record supports the trial court's findings and the trial judge was not plainly wrong when she found Graham was unavailable to testify because of Coles's wrongdoing.

### III. The Handwritten Statement Was Properly Admitted into Evidence

Coles argues that the handwritten statement of Graham's account of events was not properly authenticated and was wrongly admitted into evidence by the trial court. Specifically, Coles argues that, at the time Graham's statements were recorded, Deputy Talbard should have recorded the statements by audio or video, not handwriting. We disagree.

> Authentication does not set a high barrier to admissibility, and is generally satisfied by any form of proof that supports a finding that it is what it purports to be. Further, it is well established that the completeness of the identification goes to the weight afforded the evidence rather than its admissibility, with the responsibility of determining the threshold question of admissibility resting with the trial court.

---

[7] An inference from the statement that Graham would "be all right" if she kept her "mouth closed," is that she would *not* be all right if she testified.

*Atkins v. Commonwealth*, 68 Va. App. 1, 9 (2017) (citations, quotation marks, and formatting removed).

During the trial, Deputy Talbard identified the four-page handwritten document as the statement Graham gave him. The deputy wrote out the statement while Graham was making it in the hospital, and the deputy testified that the statement had not been altered or "messed with in any way." The deputy's testimony established that the document is what it purports to be and therefore his testimony properly authenticated the statement.

Coles's argument that the statement can only be considered authentic if it was recorded by audio or video is unsupported by legal authority. In fact, "[w]ritings may be authenticated by circumstantial evidence." *Walters v. Littleton*, 223 Va. 446, 451 (1982) (citing *Bain v. Commonwealth*, 215 Va. 89 (1974)). The Supreme Court has noted that "[t]he amount of evidence sufficient to establish authenticity will vary according to the type of writing, and the circumstances attending its admission, but generally proof of any circumstances which will support a finding that the writing is genuine will suffice." *Id.*

The document was Graham's statement, albeit transcribed by the deputy, and signed by Graham. As discussed above, the statement was properly admitted pursuant to the forfeiture-by-wrongdoing doctrine and was properly authenticated. Any concerns about the statement's reliability go to the weight a jury may give the statements contained within the transcription. There was no error in the admission of Graham's statement.

IV. The Evidence Was Sufficient to Establish that Coles Possessed the Firearm and Drugs[8]

The evidence at trial was such that a rational trier of fact could find that Coles possessed the firearm and cocaine beyond a reasonable doubt. "A conviction for the unlawful possession

---

[8] Coles did not move to strike the ammunition charge and does not argue the sufficiency of that charge on appeal.

of a firearm can be supported exclusively by evidence of constructive possession; evidence of actual possession is not necessary." *Bolden v. Commonwealth*, 275 Va. 144, 148 (2008); *see also Rawls v. Commonwealth*, 272 Va. 334, 349 (2006) (constructive possession established by showing the defendant was aware of the presence and character of the firearm and that it was subject to his dominion and control); *Bagley v. Commonwealth*, 73 Va. App. 1, 27 (2021).

Importantly, Coles does not contest the trial court's admission of the police report which indicated Graham stated that "Timothy Coles had [thrown] the bag as [Graham] was forced out of the vehicle." Furthermore, law enforcement testimony indicated the bag containing the drugs was found on the side of the road near where the officers found Graham. The bag contained, among other things, roughly two ounces of crack cocaine and hundreds of dollars in currency, along with twelve blue pills, with no alternative theory of who other than Coles might have discarded them. And Bagby testified at trial that Coles had accused her and Graham of stealing his crack cocaine. *See Commonwealth v. Hudson*, 265 Va. 505, 514 (2003) ("While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." (citations and quotation marks omitted)).

Regarding possession of the firearm, Bagby testified that Coles "pulled out a gun and he said he was going to kill [them], and he shot his gun" in the air "right in front of [them]." Putting aside the nine-millimeter bullets found in Coles's pockets and his truck or the location of the gun found the next day, uncontroverted testimony established Coles had actual possession of the gun when he shot it in the air. *See Scott v. Commonwealth*, 55 Va. App. 166, 172 (2009) ("the Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant" (quoting *Hamilton v. Commonwealth*, 16 Va. App. 751, 755 (1993))).

Graham's statements to the Pittsylvania County Sheriff's Office and the Virginia Department of Corrections simply corroborate the other evidence discussed above. The trial court made no error when it allowed the jury to determine whether Bagby's testimony and Graham's various statements were credible.

## CONCLUSION

For the foregoing reasons, the trial court did not err in admitting Graham's statements and finding the evidence sufficient to support Coles's convictions. We affirm.

*Affirmed.*